**ESTATE of Henrietta R. ALLEN, Deceased.**

**John M. ALLEN and Claude F. Clement, Co-Executors under the Will**

v.

**The UNITED STATES.**

**No. 426–75.**

United States Court of Claims.

July 8, 1977.

---

Edwin A. Heisler, Portland, Me., attorney of record, for plaintiff; Richard W. Glass, Belfast, Me., of counsel.

James L. Malone, III, Washington, D. C., with whom was Acting Asst. Atty. Gen. Myron C. Baum, Washington, D. C., for defendant; Theodore D. Peyser, Washington, D. C., of counsel.

Before NICHOLS, KASHIWA and BENNETT, JJ.

## OPINION

KASHIWA, Judge:

This tax refund action involving a question of statutory construction concerning I.R.C. § 2037(b)[1] comes before the court after the parties filed an agreed Stipulation of Facts pursuant to Rule 134(b). After briefing and oral argument, we agree with the defendant that the tables of mortality and actuarial principles as provided by the regulations under § 2037 are the exclusive method authorized to value a reversionary interest transfer taking effect at death for federal estate tax purposes. Since those regulations, at present, do not allow consideration of the actual health and physical condition of the transferee or transferor-decedent immediately prior to death, without regard to the fact of the decedent's death, the method of valuation which considers actual health and physical condition is improper. As such, the plaintiffs, in valuing the decedent's reversionary interest in the *inter vivos* trust she created, should have used the tables of mortality and actuarial principles provided in Treas.Reg. § 20.2031-10 (1970).

On October 28, 1949, Henrietta Allen, the decedent, established an irrevocable trust designating the First National Bank of Bel-fast, Maine, as trustee. The trustee was directed to pay the net income of the trust fund to the decedent's sister, Rebecca Ross ("Rebecca"), for her life. Upon the death of Rebecca, the trust was to terminate and the corpus was to revert to the decedent if she still was living. The decedent died on January 1, 1971, survived by Rebecca. In valuing the decedent's reversionary interest, the plaintiffs, as co-executors of decedent's estate, took into account the actual health and physical condition of the decedent and Rebecca and determined that the value was less than 5 percent of the value of the trust corpus.[2] Consequently, plaintiffs did not include the value of the reversion in decedent's gross estate.[3]

On audit of the estate tax return, the Commissioner of Internal Revenue ("Commissioner") valued decedent's reversionary interest in accordance with Treas.Regs. §§ 20.2037-1(c)(3) (1958) and 20.2031-10(a)(2), (e), using the tables of mortality and actuarial principles therein provided, and determined the value of decedent's reversion to be 34.158 percent of the value of the trust corpus. Accordingly, the Commissioner included the value of the trust corpus, reduced by the value of Rebecca's life estate, in the gross estate of the decedent under § 2037.[4] This inclusion of the value

---

1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954.

2. The stipulated facts are that decedent was afflicted with a fatal and incurable disease and that when the actual health and physical condition of the decedent and her sister are considered, the value of the reversionary interest immediately prior to death was less than 5 percent of the value of the trust corpus.

   It should be noted that the percentage value of the reversionary interest is independent of the monetary value of the property subject to the reverter. The reverter's value depends on the transferor's chance of recovering the property. Thus, the value of the reversionary interest contingent on survivorship is a function of the relation between the life expectancies of the transferor and transferee. The shorter the expected life of the transferor or the longer the expected life of the transferee, the less the reverter is worth.

3. See § 2037(a)(2), *infra* note 4.

4. SEC. 2037. TRANSFERS TAKING EFFECT AT DEATH.

"(a) [*as amended by* the Revenue Act of 1962, Pub.L. 87-834, § 18(a)(2)(E), 76 Stat. 1052 (1962).] *General rule.—*

"The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time after September 7, 1916, made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, if—

   (1) possession or enjoyment of the property can, through ownership of such interest, be obtained only by surviving the decedent, and

   (2) the decedent has retained a reversionary interest in the property (but in the case of a transfer made before October 8, 1949, only if such reversionary interest arose by the express terms of the instrument of transfer), and the value of such reversionary interest immediately before the death of the decedent exceeds 5 percent of the value of such property.

of the trust corpus resulted in an additional assessment of federal estate taxes, plus deficiency interest, which the plaintiffs seek to recover in this action.

The question presented is whether § 2037 permits a taxpayer to value a reversionary interest for federal estate tax purposes by use of a method of valuation which considers the actual health and physical condition of the transferee and transferor-decedent immediately prior to decedent's death without regard to the fact of death. In short, this is a case of statutory construction. The plaintiffs and defendant have differing views on the meaning of one sentence under § 2037(b). That sentence is:

 * * * The value of a reversionary interest immediately before the death of the decedent shall be determined (without regard to the fact of the decedent's death) by usual methods of valuation, including the use of tables of mortality and actuarial principles, under regulations prescribed by the Secretary or his delegate. * * *

Defendant takes the position that in this case the tables of mortality are the sole means authorized under the regulations for valuing a reversionary interest and calls our attention to the Tax Court's decision in *Estate of Roy v. Commissioner,* 54 T.C. 1317 (1970).

Plaintiffs' position is that § 2037(b) authorizes consideration of the actual facts relating to the health and physical condition of the parties to the transfer in valuing reversionary interests under § 2037. In answer to defendant's cite to *Estate of Roy,* plaintiffs refer us to *Hall v. United States,* 353 F.2d 500 (7th Cir. 1965). Generally, plaintiffs contend that the Treasury's [5] and Service's [6] positions that mortality tables are the exclusive tool for the valuation of reversionary interests under § 2037 conflict with congressional intent which, to plaintiffs, permits consideration of the actual health of persons. Plaintiffs point to what they believe are numerous indicia that Congress had not intended that tables of mortality should be the exclusive method for valuation. To plaintiffs these indicia are that the use of the plural in the phrase "usual methods of valuation" implies more than one method of computation was contemplated by Congress; that the use of the phrase "including the use of tables of mortality" implies that mortality tables should not be the exclusive tool for valuation of reversionary interests; and that the parenthetical expression "without regard to the fact of the decedent's death" would be unnecessary if mortality tables were to be the sole means for valuing reversions because mortality tables ignore the fact of death. Lastly, plaintiffs point to the fact that the regulations under § 2037 refer to Treas. Reg. § 20.2031–1 which requires that "[a]ll relevant facts and elements of value as of the applicable valuation date shall be considered in every case." [7]

The parties do not dispute the purpose of § 2037. As demonstrated in the legislative

---

"(b) *Special rules.—*

"For purposes of this section, the term 'reversionary interest' includes a possibility that property transferred by the decedent—

   (1) may return to him or his estate, or
   (2) may be subject to a power of disposition by him,

but such term does not include a possibility that the income alone from such property may return to him or become subject to a power of disposition by him. The value of a reversionary interest immediately before the death of the decedent shall be determined (without regard to the fact of the decedent's death) by usual methods of valuation, including the use of tables of mortality and actuarial principles, under regulations prescribed by the Secretary or his delegate. In determining the value of a possibility that property may be subject to a power

of disposition by the decedent, such possibility shall be valued as if it were a possibility that such property may return to the decedent or his estate. Notwithstanding the foregoing, an interest so transferred shall not be included in the decedent's gross estate under this section if possession or enjoyment of the property could have been obtained by any beneficiary during the decedent's life through the exercise of a general power of appointment (as defined in section 2041) which in fact was exercisable immediately before the decedent's death."

5. Treas.Reg. §§ 20.2031–7 (1958) and 10.

6. Rev.Rul. 66–307, 1966–2 C.B. 429.

7. Treas.Reg. § 20.2031 1(b) (1965).

history, § 2037 was introduced into the estate tax laws to eliminate the harsh results of *Estate of Spiegel v. Commissioner,* 335 U.S. 701, 69 S.Ct. 301, 93 L.Ed. 330 (1949), and to provide a dividing line between taxable and nontaxable reversions.[8] However, neither the parties nor we can find anything in the legislative history which specifically precludes consideration of the health of the decedent in valuing a reversionary interest, or anything which specifically says that mortality tables are the sole method of valuation. Since it appears that Congress did not actually consider the problem of which method of valuation should be utilized, we must focus on the general background and purpose of § 2037 and the cases cited by the parties.

The Tax Court in *Estate of Roy* held that in valuing a reversion for the purpose of § 2037 the Service's actuarial tables should be used exclusively and that no consideration should be given to the health of the decedent. The Tax Court declined to follow the Seventh Circuit decision in *Hall v. United States, supra,* which considered that the facts of the decedent's poor physical condition could override the automatic application of the actuarial tables. After close analysis of the statute and regulations, which regulations we believe are a reinforcement of congressional policy, we agree with the Tax Court and elect to follow its result.

■ We recognize the actuarial estimates of value based on the Treasury tables may

be disregarded in certain situations;[9] but for purposes of computing the value of a decedent's reversionary interest under § 2037, Congress, in establishing the 5 percent rule, has provided a rule of administrative convenience which we believe requires the application of Treasury actuarial tables notwithstanding the fact of the decedent's death or the facts surrounding the death. This conclusion is supported by the second sentence of § 2037(b).

■ As plaintiffs recognize, § 2037(b) requires that the value of reversionary interests be determined by "usual methods of valuation." Initially, this language makes it appear difficult to conclude that mortality tables alone may be used in valuation. In fact, this particular clause persuaded the court in *Hall* to decide the case as it did.[10] We, however, do not place any independent meaning on this requirement.[11] We feel that the specific delegation to the Secretary of authority to issue regulations dealing with valuation suggests that "usual methods" should be those defined by Treasury decision and that the methods chosen should include tables of mortality and actuarial principles. The Secretary has followed this mandate and issued regulations dealing with valuation. The fact that those regulations provide for the exclusive and routine use of actuarial tables to measure the value of a reversionary interest when the particular interest is subject to actuarial evaluation does not, in our opinion, exceed the scope of the delegated power. The regula-

8. Following the *Spiegel* decision, Congress passed the Technical Changes Act of 1949, ch. 720, § 7(a), 63 Stat. 894 (1949), which amended § 811(c) of the Internal Revenue Code of 1939. For transfers after October 7, 1949, *Spiegel* was given expanded application; for transfers on or prior to that date, *Spiegel* was given restricted application. However, when Congress enacted § 2037 in 1954, it essentially replicated the provision in the 1949 legislation which applied to pre-1949 transfers: no transfer was taxable unless the transferor retained a reversionary interest which was more than 5 percent of the value of the transferred property immediately before the transferor's death.

9. *See, e. g., Miami Beach First Nat'l Bank v. United States,* 443 F.2d 116 (5th Cir. 1971); *Estate of Lion v. Commissioner,* 438 F.2d 56

(4th Cir.), *cert. denied,* 404 U.S. 870, 92 S.Ct. 52, 30 L.Ed.2d 114 (1971); *Estate of Butler v. Commissioner,* 18 T.C. 914 (1952); *Estate of Jennings v. Commissioner,* 10 T.C. 323 (1948); *Estate of Denbigh v. Commissioner,* 7 T.C. 387 (1946). *See also* Rev.Rul. 66–307, 1966–2 C.B. 429.

10. 353 F.2d at 503–504.

11. However, it should be noted that our interpretation does not eliminate the phrase "usual methods of valuation" from the statute. Instead, we interpret that provision to apply to those reversionary interests which cannot be valued actuarially. See discussion *infra* at note 16.

tions promulgated under this specifically delegated authority are commonly referred to as "legislative" regulations. It may be broadly stated that legislative regulations are given force and effect of law unless the regulations exceed the scope of the delegated power,[12] are contrary to the statute,[13] or are unreasonable.[14] Having the effect of law, these regulations would bind the Commissioner as well as the taxpayer. As we construe these regulations promulgated by the Secretary pursuant to his authority, we believe that they require an actuarial determination of life expectancy, without regard to extrinsic evidence such as the actual life expectancy of the decedent here involved. Those regulations neither exceed the scope of the delegated power nor are contrary to the statute; furthermore, we do not find them unreasonable since, in our opinion, they promote both ease of administration and even-handed relief of the tax laws without undermining the settled policy embodied in the basic plan of § 2037.[15]

The background of § 2037 demonstrates that one of the purposes of the statute is to tax transfers with a reversionary interest contingent on survivorship when they are used as testamentary substitutes. To consider health in valuing this type reversionary interest seems to us to detract considerably from this purpose. To assume, as plaintiffs have done, that Congress intended estate tax consequences to turn on the decedent's state of health just before death would create discrimination between decedents who were in good health prior to death and decedents who died after a long illness. That is, if estate tax consequences turned on the decedent's state of health, the life expectancy of a decedent who was in good health prior to death would presumably be determined by mortality tables, while the life expectancy of a decedent who died after a long illness would be determined differently. This does not seem proper to us. Notwithstanding this policy consideration, we must address plaintiffs' contentions that explicit language of the Code does not allow the Secretary to prescribe actuarial tables as the exclusive means to value reversionary interests.

If one thing is certain, it is that " * * * no single method of valuation of a reversion can be prescribed in view of the large variety of reversionary interests."[16] In other words, not all reversionary interests can be valued actuarially.[17] The more dependent a reversionary interest is on facts peculiar to a particular transfer, the less useful actuarial principles are in valuing that reversionary interest. As such, we believe that the provisions "usual methods of valuation" and "without regard to the fact of the decedent's death" only apply to interests which cannot be valued actuarially. When a reversionary interest can be valued actuarially, we interpret the Code to allow exclusive use of actuarial principles. This interpretation of the statutory language not only gives effect to all provisions in § 2037(b) but also harmonizes Treas.Reg. § 20.2031–1 with §§ 20.2031–7 and 20.2031–10.

Treasury Regulation § 20.2037–1(c)(3) provides that " * * * the value of the decedent's reversionary interest * * * is ascertained in accordance with recognized valuation principles for determining the value for estate tax purposes of

**12.** *Panama Ref. Co. v. Ryan*, 293 U.S. 388, 55 S.Ct. 241, 79 L.Ed. 446 (1935).

**13.** *M. E. Blatt Co. v. United States*, 305 U.S. 267, 59 S.Ct. 186, 83 L.Ed. 167 (1938).

**14.** *Bingler v. Johnson*, 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969).

**15.** *See*, Note, *"Estate Taxes: Use of Actual Life Expectancies in Determining the Value of a Reversionary Interest,"* 66 Colum.L.Rev. 797 (1966).

**16.** *Estate of Roy v. Commissioner*, 54 T.C. at 1322.

**17.** For example, actuarial principles cannot value a reversionary interest contingent on death without issue. *See Commissioner v. Estate of Sternberger*, 348 U.S. 187, 75 S.Ct. 229, 99 L.Ed. 246 (1955); *Humes v. United States*, 276 U.S. 487, 48 S.Ct. 347, 72 L.Ed. 667 (1928).

future or conditional interests in property. (See §§ 20.2031–1, 20.2031–7, and 20.2031–9)." Section 20.2031–1(b) states that for valuation of property in general "[a]ll relevant facts and elements of value as of the applicable valuation date shall be considered in every case. * * * See § 20.-2031–2 and §§ 20.2031–4 through 20.2031–8 for further information concerning the valuation of other particular kinds of property." Following the reference provided in § 20.2031, we turn to the regulatory language under § 20.2031–7 which concerns valuation of annuities, life estates, terms for years, remainders, and reversions. However, since the decedent in the instant case died after December 31, 1970, we must turn to § 20.2031–10, which is identical to § 20.2031–7 except that it employs updated annuity tables. Section 20.2031–10(a)(2) provides:

> (2) The present value of an annuity, life estate, remainder or reversion determined under this section which is dependent on the continuation or termination of the life of one person is computed by the use of Table A(1) or A(2) in paragraph (f) of this section. * * * Table A(2) is to be used when such a person is a female. * * * If the interest to be valued is dependent upon more than one life * * see paragraph (e) of this section. For purposes of the computations described in this section, the age of a person is to be taken as the age of that person at his nearest birthday.

Section 20.2031–10(e) relates to the actuarial computations to be used, and subsection (f) of § 20.2031–10 provides the following mandate: "The following tables shall be used in the application of the provisions of this section:." Thereafter reproduced are actuarial tables based upon the *United States Life Tables: 1959–61,* published by the Department of Health, Education and Welfare.

As their basic premise, plaintiffs submit that § 20.2037–1(c)(3) refers to valuation principles rather than to mortality tables. Focusing on § 20.2031–1(b), which requires that all relevant facts and elements be considered, plaintiffs postulate that if Congress and the Treasury had intended to limit valuations to mortality tables, the statute and regulations would have explicitly so stated. Also, plaintiffs intimate that defendant's interpretation of § 20.2031–10 is inconsistent with § 20.2031–1.[18]

We do not subscribe to plaintiffs' theory. Section 20.2037–1(c)(3) refers the taxpayer to § 20.2031–10. We believe that the mandate of § 20.2031–10 is clear: that the value of a reversionary interest, if subject to actuarial valuation, is required to be determined solely on the mortality tables therein provided. This interpretation is not inconsistent with § 20.2031–1, which provides that all factors and elements of value be considered in every case. Section 20.2031–1(b) is a provision providing for valuation of property in general; § 20.2031–10, on the other hand, specifically concerns valuation of reversions, among other things. It is our opinion that § 20.2031–10 takes precedence over § 20.2031–1 which is the more general section on valuation of gross estates.[19] This interpretation is also consistent with our previous discussion concerning the scheme of valuation with relation to the statutory provisions. That is, § 20.2031–10 requires the use of actuarial tables to measure the value of a reversionary interest whenever the interest is subject to actuarial evaluation; the more general methods prescribed in § 20.2031–1, allowing consideration of all relevant facts, apply only when a particular interest is not subject to actuarial evaluation.

■ As the Tax Court noted:

> By adopting * * * [this] construction of section 2037 * * * we have stayed within the framework of the rule of statutory construction set down by the

---

**18.** *See also Hall v. United States,* 353 F.2d at 504.

**19.** *Bulova Watch Co. v. United States,* 365 U.S. 753, 758, 81 S.Ct. 864, 6 L.Ed.2d 72 (1961);

*Townsend v. Little,* 109 U.S. 504, 512, 3 S.Ct. 357, 27 L.Ed. 1012 (1883); *General Dynamics Corp. v. United States,* 324 F.2d 971, 974, 163 Ct.Cl. 219, 223 (1963).

Supreme Court in *Sunshine Coal Co. v. Adkins,* 310 U.S. 381, 392 [60 S.Ct. 907, 84 L.Ed. 1263] (1940), wherein it was said that an "alternative [which would seriously impair the effectiveness of a statute] will not be taken where a construction is possible which will preserve the vitality of the Act and the utility of the language in question." [20]

NICHOLS, Judge, concurring:

With a qualification to be stated, I join in Judge Kashiwa's able opinion, which states all of the plaintiffs' arguments and cuts each one down with meticulous care. I found the case on its facts an easy one, as our cases go, because I reached the same result by a shorter and well trodden route—the rule that courts will not construe a statute literally to produce absurd results beyond the known or probable intention of the Congress. *Church of The Holy Trinity v. United States,* 143 U.S. 457, 459, 12 S.Ct. 511, 36 L.Ed. 226 (1892). This principle obtains in interpretation of the United States revenue laws. *Select Tire Salvage Co. v. United States,* 386 F.2d 1008, 181 Ct.Cl. 695 (1967), and cases there cited. If Congress intended the value of the possibility of reverter immediately before death to be appraised on the basis of the causes that produced the death, it intended to introduce a joker in the statute, for the five percent exception would all but obliterate the rule. The only cases the rule would cover would be those of virtually instantaneous deaths, as, *e. g.,* in homicides and other accidental deaths, and even then, if the victim lingered an hour or two before expiring, presumably the life expectancy and therefore the application of the five percent rule would be evaluated as of that period. As to people dying of disease in bed, it is easy to picture the tax lawyer and accountant hovering about the premises to make sure the decedent still breathed when the magic five percent point was passed. In many cases, the inquiries for the tax man to make would be grisly and macabre. If a person died by drowning, do you determine his life

expectancy as of when he was already in the water? Would it depend on how long he remained afloat? Or whether he knew how to swim? Congress may occasionally legislate with tongue in cheek, but it is not capable of the black humor our plaintiffs impute to it.

When Congress said the reversion was to be evaluated "without regard to the fact of the decedent's death" (see § 2037, text in Judge Kashiwa's footnote 4), I am sure it meant without regard to the injury or illness that caused the death. When, *e. g.,* the decedent had a long history of disease and degeneration and was then carried off by some unrelated cause, the consideration of the former condition, in determining life expectancy for application of the five percent rule, is not so absurd nor so contrary to the statutory language. That may have been the situation in *Hall v. United States,* 353 F.2d 500 (7th Cir. 1965). It is hard to tell whether the court deemed the massive cerebral hemorrhage that terminated the decedent's life to have been a natural consequence of the long list of ailments that caused her final hospital admission fully four years previously. At any rate, the actuarial testimony for that plaintiff excluded from consideration not only the fact of death itself, but also "the immediate cause of her death." *Id.* at 503. In our case it is conceded that decedent's life expectancy was calculated by the executors with respect to the terminal illness from which she suffered and of which she died. Thus, the positions of the two estates were not identical, a circumstance that to some degree mitigates the starkness of the conflict we are going into with the Seventh Circuit. Neither their words nor ours, however, admit any difference in the two cases, nor do the Treasury regulations. For myself, I would like to limit my concurrence to the facts we actually are passing on.

The stipulation states that our decedent, Henrietta R. Allen, had a life expectancy of 14 weeks as of November 26, 1970. She died January 1, 1971. If there was any reason, under plaintiffs' view of the law,

---

**20.** *Estate of Roy v. United States,* 54 T.C. at 1323.

for stating the expectancy as of so long before death, the court never learned what it was. Plaintiffs' counsel asserted, or admitted, as one prefers, that he would be entitled to prevail, by his view, if the value of the reversion dropped under five percent only in the last day of life, only, perhaps, in the final hour. That is the position we are rejecting, but no way of backdating the determination can be suggested that is consistent with the statute's requirement that the value of the reversion be fixed as of a time "immediately before death."

Thus, the decisive consideration is that we are asked to sponsor an absurd interpretation of the statutes and regulations, absurd in this case and in any other when the decedent's declining life expectancy in his or her final weeks, or days, or hours, resulted from the same cause as death itself resulted from.

### Conclusion of Law

As previously mentioned, although it appears that Congress did not consider the problem of which method of valuation should be utilized to value reversions under § 2037, it did specifically authorize the Secretary to promulgate regulations setting forth methods of valuation which were to include mortality tables. Those regulations, which we believe are a reinforcement of congressional policy, neither exceed the scope of the delegated power nor are contrary to the statute; rather, we believe that those regulations reasonably require the use of the regulations' actuarial tables to value a reversionary interest under § 2037 whenever life expectancy must be determined. Other methods of valuation may be used to determine the chance of the reversionary interest becoming operative in a particular situation only when actuarial principles cannot apply.

We subscribe to the position presented by the Tax Court in *Estate of Roy v. Commissioner, supra,* and reject the position adopted by the Seventh Circuit in *Hall v. United States, supra.* Accordingly, upon our foregoing opinion, which contains the essential findings of fact as stipulated by the parties,

the court concludes as a matter of law that in valuing decedent's reversionary interest the Commissioner did not err in failing to take into account the actual health and physical condition of the decedent and her sister; we dismiss plaintiff's petition.