Kent ROBINSON, Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. No. 75–1970 GBH.

United States District Court, N. D. California.

June 5, 1978.

Jeffrey F. Beck, San Francisco, Cal., for plaintiff.

Richard J. Sideman, Asst. U. S. Atty., Tax Div., San Francisco, Cal., for defendant.

## MEMORANDUM OF DECISION

GEORGE B. HARRIS, Senior District Judge.

This is an action for the refund of federal estate taxes of $22,824.90, plus assessed interest of $3,513.78, for a total of $26,338.68 plus statutory interest. The plaintiff is the executor of the estate and also a son of the decedent, Hazel S. Robinson, who died in San Francisco on November 13, 1968.

The matter was tried to the court sitting without a jury, and thereafter submitted for decision on the arguments and legal memoranda of counsel.

### I. *The Issues*

The tax at issue was levied and collected under § 2037 of the Internal Revenue Code of 1954, 26 U.S.C. § 2037. Section 2037 declares that the gross estate of a decedent shall include the value of property transferred by the decedent during her lifetime, if possession and enjoyment can be obtained only if the beneficiary survives the decedent, and if the decedent has retained a reversionary interest in the property which has a value of more than five percent of the property's value.

This cases poses two issues:

(A) Whether the terms of an *inter vivos* trust created by the decedent in 1920 are to be construed to mean that her reversionary interest would become effective if she survived her son, Kent Robinson, or whether the trust required that she also survive the issue of Kent Robinson before her reversion would occur; and

(B) Whether, in valuing the decedent's reversionary interest, the court should use tables of mortality and actuarial principles, as the Government contends, or also take into account the decedent's actual poor physical condition just prior to death, as the plaintiff contends.

### II. *The Factual Background*

The facts here are not in dispute. Hazel S. Robinson died testate on November 13, 1968. Plaintiff is the decedent's sole surviving son and executor of her estate.

On February 13, 1970, the plaintiff filed a federal estate tax return and paid the amount of estate tax liability shown on the return. An audit of the return by the Internal Revenue Service resulted in a determination that plaintiff's computation of the gross estate should have included assets in the amount of $76,039.00. Such assets represented one-half of an interest in an *inter vivos* trust created by the decedent on February 11, 1920 in the State of New York.

The Internal Revenue Service assessed an estate tax liability against the plaintiff in the amount of $22,824.90, together with assessed interest of $3,513.78. The plaintiff paid the assessed liabilities and filed a claim for refund on April 18, 1974. Thereafter, the Internal Revenue Service disallowed the claim, and the plaintiff filed the instant action on September 19, 1975.

The subject trust of February 11, 1920 was irrevocable and provided in pertinent part:

Upon the further trust upon the death of said HAZEL LEWIS ROBINSON, to divide the principal of said trust into two equal parts in such a manner as to make an equitable division as to value, and to collect and receive the interest and income arising from one of said two equal parts of said principal of said trust fund or estate, and after paying from such income the proper current disbursements and charges incident to said equal part of the principal of the said trust fund or estate, to pay the net residue of such interest and income to CLARENCE ROBINSON, son of said HAZEL LEWIS ROBINSON, until he shall attain the age of thirty years, and upon his attaining said age to pay over and deliver the principal of said equal part to him, and if the said CLARENCE ROBINSON shall die before attaining the age of thirty years,

**1162**

then upon the death of said CLARENCE ROBINSON to pay over and deliver the principal of said equal part to the next of kin of said CLARENCE ROBINSON, and to collect and receive the interest and income arising from the second of said equal parts of said principal of said trust fund or estate, and after paying from such income the proper current disbursements and charges incident to said equal part of the principal of the said trust fund or estate, to pay the net residue of such interest and income to KENT ROBINSON, son of said HAZEL LEWIS ROBINSON, until he shall attain the age of thirty years, and upon his attaining said age to pay over and deliver the principal of said equal part to him and if the said KENT ROBINSON shall die before attaining the age of thirty years, then upon the death of said KENT ROBINSON to pay over and deliver the principal of said second of said equal parts to the next of kin of said KENT ROBINSON. AND IT IS HEREBY FURTHER PROVIDED, DECLARED AND AGREED that in the event that both said CLARENCE ROBINSON and KENT ROBINSON, children of said party of the first part, shall die before the said party of the first part, then upon the death of HAZEL LEWIS ROBINSON, said party of the first part, the parties of the second part, their successor or successors shall pay, transfer and set over the principal of the said trust fund to such person or persons as the said HAZEL LEWIS ROBINSON, the party of the first part, shall by her last will and testament appoint and direct and in the manner in her said will provided.

Clarence Robinson died during World War II. The plaintiff included in the gross estate the one-half fair market value of the trust attributable to Clarence Robinson's portion because his one-half was payable to the decedent's estate at her death under the terms of her will.

At the time of the decedent's death, Kent Robinson had two children and five grandchildren.

During the last five years of her life, the decedent was in a continuously failing state of health. Two years before her death, her health began to fail much more rapidly; between August 1966 and her death in November 1968, the decedent was hospitalized on eight separate occasions.

Death was caused by a cardiac arrest, following a long period of congestive heart failure and immediately preceded by aspiration pneumonia. The congestive heart failure was noted in the decedent's medical records as having existed since late 1966. The treatment of her congestive heart failure was complicated by a chronic urinary tract infection and diabetes mellitus.

During the last two years of her life, the decedent's state of health was impaired by the conditions just described. By reason thereof, she had a reduced life expectancy or "mortality" of at least 200 percent.

These actual health factors, if taken into account by an actuary applying tables of mortality, would cause a statistical 4.02 percent valuation to be placed upon the likelihood that decedent would survive Kent Robinson.

On the other hand, if the extrinsic facts concerning decedent's health were not taken into account and the same mortality tables provided by Treasury Regulations §§ 20.2037–1(c)(3) and 20.2031–7(f) Appendix were applied to decedent's life expectancy, then the value of the decedent's reversionary interest would amount to 8.47 percent.

### III. Interpretation of the Inter Vivos Trust

The first issue before the court concerns the proper interpretation of the reversionary interest language contained in the *inter vivos* trust executed by the decedent on February 11, 1920.

Plaintiff interprets the trust to require that if Kent Robinson predeceased his mother, the decedent, Kent Robinson's interest would first go to his heirs before reverting to his mother. Therefore, plaintiff concludes, the decedent's reversionary

interest in Kent Robinson's portion was contingent upon her surviving not only Kent, but also his issue.

Plaintiff argues that a reading of all pertinent parts of the trust reveals that it must have been the decedent-settlor's intention to make the issue of her children remainder beneficiaries. This, continues plaintiff, is clear from the language passing a son's interest to his children in the event the son died before reaching age 30.

The Government counters that it is illogical for the decedent to have created a reversionary interest in herself only if she survived at least three successive generations of her own offspring. The Government relies on the fact that the trust retained a general power of appointment in the decedent in the event that both sons predeceased her, thus demonstrating her intention to control the disposition of each of her son's allocable portion of the trust corpus upon the death of such son before her own death. Her reversionary interest, then, would be superior to that of her children's issue in the event that both of her sons predeceased her.

The issue posed is a difficult one, and cannot be resolved solely by reference to accepted canons of trust interpretation nor by reference to any extrinsic evidence. Although the language of the trust instrument is arguably susceptible of more than one interpretation, decision in the instant case requires that the court adopt that construction which would most reasonably carry out the intention of the settlor.

■ On balance, the position taken by the Government appears to be the most persuasive. It seems unlikely that decedent would have created a reversionary interest which would require her surviving not only her children, but also her grandchildren and even great-grandchildren. The court is particularly influenced by the decedent's power of appointment, for this clearly brought her sons' trust interests into her estate upon their both predeceasing her, thus running contrary to the position taken by plaintiff that it was her intention to place the interests of her children's issue ahead of her own.

## IV. *Valuing the Decedent's Reversionary Interest*

The second issue presented here is whether the decedent's reversionary interest was more or less than five percent of the value of the subject *inter vivos* trust.

Plaintiff argues that if the actual facts of decedent's health shortly before her death are taken into account, her reversionary interest would be worth 4.02 percent and thus be excludible from her taxable estate under the provisions of 26 U.S.C. § 2037(a)(2). The Government, however, argues that use of such extrinsic factors is impermissible and that, under the mortality tables and actuarial principles mandated by § 2037 and the Treasury Regulations adopted thereunder, decedent's reversionary interest was worth 8.47 percent and would, therefore, require that such interest be included in her taxable estate.

The pivotal language here is contained in § 2037(b)(2):

\*     \*     \*     \*     \*     \*

The value of a reversionary interest immediately before the death of the decedent shall be determined (without regard to the fact of the decedent's death) by usual methods of valuation, including the use of tables of mortality and actuarial principles, under regulations prescribed by the Secretary or his delegate.

\*     \*     \*     \*     \*     \*

■ The "regulations prescribed by the Secretary or his delegate include those in 26 C.F.R. 20.2031–7 and the mortality tables referenced therein. The position of the Internal Revenue Service, and that taken by the Government herein, rests upon an application of such tables to the exclusion of extrinsic evidence concerning decedent's abnormally poor health immediately prior to her dying.

Plaintiff reads the language of § 2037(b)(2) to permit use of such evidence where the mortality tables provided by statute do not accurately reflect the true state

of the decedent's health. Plaintiff supported his contention with the testimony of an expert actuary who estimated the decedent's mortality rate immediately prior to death as double that of normal. It was upon that expert's calculations that plaintiff arrived at the figure of 4.02 percent as the value of decedent's reversionary interest.

The sparse legal authority on this issue is split, but the weight of recent authority, and the better reasoned authority, supports the position of the Government.

The plaintiff relies heavily on *Hall v. United States*, 353 F.2d 500 (7th Cir. 1965). The court therein, faced with a similar issue, concluded that § 2037 did not contemplate that valuation would be determined in all cases solely by use of tables of mortality and actuarial principles prescribed by the Secretary. The court interpreted "usual methods of valuation" to require or at least permit taking into consideration the actual life expectancies of the parties involved. 353 F.2d at 504–505.

Clearly, the *Hall* case flies in the face of the statutory language which it was construing, and it is not surprising that the case has been since criticized and not followed.

In *Estate of Roy*, 54 T.C. 1317, 1324 (1970), the court was unable to distinguish *Hall*, but simply declined to follow it. The court reasoned there that if *Hall* were followed, § 2037 would be inapplicable to all but those infrequent instances where one died suddenly, thus rendering it inoperative where terminal illness preceded death.

Similarly, the recent case of *Estate of Allen*, 558 F.2d 14 (Ct.Cl.1977), held that the tables of mortality and actuarial principles provided by the regulations under § 2037 were the exclusive method authorized to value a reversionary interest transfer taking effect at death for federal estate tax purposes. *Id.* at 16. The court found that the method which considered actual health and physical condition was improper. *Id.*

The court in *Allen* cited *Roy* with approval, but specifically declined to follow *Hall*.

It interpreted "usual methods of valuation" to apply to interests which could not be valued actuarially. *Id.* at 19.

Judge Nichols, in concurring, echoed that concern expressed in *Roy* that the result reached by the majority in *Allen* was necessary lest the five percent exception of § 2037 be restricted to cases of instantaneous death. *See also* Note, 54 Cal.L.Rev. 2180 (1966).

### V. *Conclusion*

Accordingly, for the foregoing reasons, the court finds and concludes for the defendant. Defendant is hereby directed to prepare and submit a form of judgment consistent with the foregoing.

It is so ordered.