**Kent ROBINSON, Plaintiff–Appellant,**

v.

**The UNITED STATES of America, Defendant–Appellee.**

**No. 78–3083.**

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Sept. 10, 1980.

Decided Nov. 13, 1980.

---

Jeffrey F. Beck, San Francisco, Cal., for plaintiff–appellant.

Jonathan A. Cohen, David I. Pincus, Washington, D.C., for defendant–appellee.

Before MARKEY,* Chief Judge, United States Court of Customs and Patent Appeals, MERRILL and BOOCHEVER, Circuit Judges.

MARKEY, Chief Judge.

Kent Robinson (Robinson) appeals from a judgment of the United States District Court, 454 F.Supp. 1160, for the Northern District of California denying his claim for the refund of federal estate taxes which he paid as Executor of the estate of his mother, Hazel S. Robinson (Decedent). We *affirm.*

---

* The Honorable Howard T. Markey, Chief Judge, United States Court of Customs and Patent Appeals, sitting by designation.

*Background*

Robinson's mother died in San Francisco on November 13, 1968. Robinson filed a federal estate tax return on February 13, 1970. On audit, the Internal Revenue Service determined and assessed additional tax liability of $22,824.90 plus $3,513.78 interest. Robinson paid the assessment on September 18, 1972. The additional tax liability was assessed under 26 U.S.C. § 2037 (1976)[1] and resulted from the inclusion in Decedent's taxable estate of the value of a trust created by her on February 11, 1920, in which she reserved to herself a conditional testamentary power of appointment.

Following Treasury Regulations 20.2031–7(a)(2), (e), and using United States Life Table 38 provided therein, the Commissioner determined the value of Decedent's reserved power of appointment, classified as a "reversionary interest" under § 2037(b)(2), to be 8.47% of the value of the trust corpus. Because that value exceeded 5%, the Commissioner considered the trust corpus includible in the gross estate and taxable under § 2037(a)(2).

The subject trust was irrevocable and provided in pertinent part:

Upon the further Trust upon the death of said HAZEL LEWIS ROBINSON, to divide the principal of said trust into two equal parts . . . and to collect and receive the interest and income arising from one of said two equal parts . . . and after paying from such income the proper current disbursements and charges . . . to pay the net residue of such interest and income to CLARENCE ROBINSON, son of said HAZEL LEWIS ROBINSON, un-

til he shall attain the age of thirty years, . . . and if the said CLARENCE ROBINSON shall die before attaining the age of thirty years, then upon the death of said CLARENCE ROBINSON to pay over and deliver the principal of said equal part to the next of kin of said CLARENCE ROBINSON, and to collect and receive the interest and income arising from the second of said equal parts of said principal of said trust fund or estate, and after paying from such income the proper current disbursements and charges . . . to pay the net residue of such interest and income to KENT ROBINSON, son of said HAZEL LEWIS ROBINSON, until he shall attain the age of thirty years, . . . and if the said KENT ROBINSON shall die before attaining the age of thirty years, then upon the death of said KENT ROBINSON to pay over and deliver the principal of said second of said equal parts to the next of kin of said KENT ROBINSON.

AND IT IS HEREBY FURTHER PROVIDED, DECLARED AND AGREED that in the event that both said CLARENCE ROBINSON and KENT ROBINSON, children of said party of the first part, shall die before the said party of the first part, then upon the death of HAZEL LEWIS ROBINSON, said party of the first part, the parties of the second part, their successor or successors shall pay, transfer and set over the principal of the said trust fund to such person or persons as the said HAZEL LEWIS ROBINSON, the party of the first part, shall by her last will and testament appoint and direct

---

1. 26 U.S.C. § 2037, in pertinent part, provides:
 (a) General rule. The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time after September 7, 1916, made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, if—
 (1) possession or enjoyment of the property can, through ownership of such interest, be obtained only by surviving the decedent, and
 (2) the decedent has retained a reversionary interest in the property (but in the case of a transfer made before October 8, 1949, only if such reversionary interest arose by the express terms of the instrument of transfer), and the value of such reversionary interest immediately before the death of the decedent exceeds 5 percent of the value of such property.
 (b) Special rules. For purposes of this section, the term "reversionary interest" includes a possibility that property transferred by the decedent—
 (1) may return to him or his estate, or
 (2) may be subject to a power of disposition by him, . . .

and in the manner in her said will provided.

Robinson's bother Clarence having predeceased Decedent, the fair market value of Clarence's share of the trust was included by Robinson in Decedent's gross estate.

On April 18, 1974, Robinson filed a claim for refund of the assessment, claiming that inclusion of his half of the trust was improper. The claim was disallowed on December 3, 1974, and Robinson brought this action on September 19, 1975.

Robinson maintained that the reversionary interest was improperly valued because: (1) the trust instrument was improperly construed to make the power of appointment effective when Decedent survived her sons only, rather than when she also survived all issue of her sons;[2] and, (2) the Commissioner's valuation method failed to consider the actual health and physical condition of Decedent. Adoption of either contention would result in valuation of the reversionary interest at below the 5% threshold requirement of § 2037(a)(2) and a consequent impropriety in including the trust corpus in the estate.[3]

The District Court rejected both contentions, and entered judgment on July 5, 1978, finding that Decedent had retained a reversionary interest in excess of 5% of the value of the trust property. From that judgment, Robinson appeals.

### Issues

Whether: (1) the trust instrument should be construed to render the power of appointment effective only upon Decedent's surviving her sons and all issue of her sons; and (2) the IRS, in evaluating a reversionary interest for federal estate tax purposes under 26 U.S.C. § 2037, must use a method which considers the actual health and physical condition of the decedent immediately prior to decedent's death without regard to the fact of death.

### Opinion

#### I. Construction of Trust Instrument

 Robinson correctly says the applicable law requires that the trust instrument be examined as a whole and that it be construed to give effect to the settlor's intention.[4] *Application of United States Trust Co. of N.Y.*, 114 N.Y.S.2d 336 (Sup.Ct. 1952).

Robinson then says the instrument's remainder provisions indicate that the issue of Decedent's children are intended remainder beneficiaries, and that it was Decedent's expressed intent that the remainder interest reside first in her children and next in the issue of her children, with the reversionary power of appointment to take effect only in the event she survived her sons and all issue of her sons. He finds that intention in the language passing a son's interest to his children (i. e., as his "next of kin") if the son dies before age 30, and in the absence of any indication that the interests of her son's children shall exist only in those circumstances.

Whatever may be said of other portions of the trust instrument, the language establishing the reserved testamentary power of appointment is clear and unambiguous, and its plain language must therefore control. Nothing in the remainder provisions renders the power of appointment provision ambiguous. Although, as Robinson notes, the trust remainder provisions leave unanswered questions relating to the disposition

2. At the time of Decedent's death, Robinson had 2 children and 5 grandchildren.

3. During the last five years of her life, Decedent was in a continuously failing state of health. In 1966, her health failed rapidly. Death was caused by a cardiac arrest following a 2–year period of congestive heart failure. The parties stipulated that during the last two years Decedent had a less than normal life expectancy of at least 200% normal mortality.

Consideration of Decedent's poor state of health would produce a reversionary interest value of 4.02%.

4. The trust having been created and administered in New York, that state's law controls the construction of the trust instrument. *In re Waterbury's Trust*, 35 Misc.2d 723, 231 N.Y. S.2d 208 (Sup.Ct.1962).

of the trust remainder,[5] those questions have no relevance when the provision at issue, that is, the provision reserving the testamentary power of appointment, is clear and susceptible of but one interpretation.

Robinson would have us ignore the plain and unambiguous language of the settlor. We cannot. The duty of a court is to construe a trust instrument as written. It may not, under the guise of construction or otherwise, make a new trust agreement for the parties or read into the trust instrument provisions not expressly there or not arising necessarily from the ordinary meaning of the words used. No technical rules of construction nor artificial analysis of language used may defeat settlor's intention where that intention is manifest in the language of the trust instrument itself. *Farmers' Loan & Trust Co. v. Callan*, 246 N.Y. 481, 159 N.E. 405 (Ct.App.1927); *In re Fields' Trust*, 302 N.Y. 262, 97 N.E.2d 896 (Ct.App. 1952).

The trust provision creating the power of appointment provides in pertinent part:

[I]n the event that both said Clarence Robinson and Kent Robinson ... shall die before the [Decedent] ..., then upon the death of [Decedent] ..., the [trustees] ... shall pay, transfer and set over the principal of the said trust fund to such person or persons as the [Decedent] ..., shall by her last will and testament appoint and direct and in the manner her said will provided.

It is clear from this language that Decedent intended the power of appointment to become effective if her sons predeceased her. There is nothing to suggest that Decedent intended that an additional prerequisite to the power of appointment becoming effective be that she also survive all issue of her sons. If Decedent had intended the

latter, it would have been a simple matter for her to have included appropriate language, in much the same way as she did in the remainder provisions that an interest of a son in certain circumstances shall pass to his next of kin. She did not choose to include such language, and we cannot do so for her. The plain language of the trust instrument must be construed to render the power of appointment effective upon Decedent's surviving her sons.

## II. *Valuation of the Reversionary Interest*

Robinson says the Government, in evaluating the reversionary interest, improperly relied exclusively on Table 38 of the U.S. Life Tables and Actuarial Tables 1939–1941. Table 38 is a normal–health mortality table which provides average life expectancy figures from which a calculation of the value of a reversionary interest dependent upon the continuation or termination of more than one life may be made. Robinson contends that the exclusive use of Table 38 life expectancy figures is improper here because Decedent had a reduced life expectancy of at least 200% normal mortality during the last two years of her life. He asserts that § 2037 in these circumstances requires consideration of the actual state of health of Decedent to compute an accurate value of her reversionary interest.[6]

In *Hall v. United States*, 353 F.2d 500 (7th Cir. 1965), the Seventh Circuit held that the state of health should be considered in computing the value of a decedent's reversionary interest in a trust for purposes of § 2037. The Government says the better reasoned case law supports an exclusive use of mortality tables, citing *Estate of Allen v. United States*, 558 F.2d 14 (Ct.Cl.1977); and *Estate of Roy v. Commissioner*, 54 T.C. 1317 (1970). The courts in these cases held use of mortality tables prescribed by the Treasury Regulations the

---

**5.** For example, whether a son is over thirty when the settlor dies should at that time receive his share outright, free of the trust.

**6.** In the district court proceeding, Robinson offered the testimony of William D. Smith, a professional actuary, who said failure to consider the impaired health of Decedent would produce an incorrect valuation of her reversionary interest. He would adjust the mortality factor from Table 38 by a 200% increased mortality rate to produce a correct valuation.

only permissible method of valuation. We agree with that view.

Section 2037(b)(2) provides in applicable part:

The value of a reversionary interest immediately before the death of the decedent shall be determined (without regard to the fact of the decedent's death) by usual methods of valuation, including the use of tables of mortality and actuarial principles, under regulations prescribed by the Secretary.

The court in *Hall* stated:

It is plain that the statute does not contemplate that valuation shall be determined . . . solely by the use of tables of mortality and actuarial principles prescribed by the Secretary . . . What the statute provides is that such valuation shall be determined "by usual methods of valuation", including mortality tables prescribed by the Secretary.

*Hall v. United States, supra,* at 503.

With due respect, we decline to adopt the interpretation set forth in *Hall.* In our view, the statute authorizes the Secretary to prescribe regulations employing appropriate methods found among the "usual methods of valuation". It does not require the Secretary to employ any particular "usual method" or to employ all such "usual methods" (such as consideration of state of health). Mortality tables and actuarial principles are listed in the statute as among the "usual methods" from which the Secretary is empowered to choose.

In accord with the authority granted in § 2037(b)(2), the Secretary has chosen to promulgate regulations dealing with valuation as reflected by 26 CFR 20.2037–1,

which in turn refers to 26 CFR §§ 20.2031–1 through 20.2031–10. Those regulations, having been promulgated pursuant to an express grant of authority, carry a strong presumption of validity. Robinson has made no showing that the regulations are beyond the Secretary's authority, or that they are contrary to statute, or that they are unreasonable.[7] Use of Table 38, one of the "mortality tables", is a "usual method of valuation" within the meaning of the statute and use of such tables has long been regarded as a workable forecasting technique.

Moreover, consideration of decedent's health would raise a substantial problem in selecting the date on which to make that determination. In this case petitioner suggests a date two years prior to decedent's death. Because no regulation establishes that or any other date, it would be just as logical to select a date closer to or further from the date of death. In many cases the decedent's health will have varied substantially, yet the eventual determination of life expectancy would be dependent on the decedent's health on the particular date selected. Consideration of the decedent's health would thus engender uncertainty and a fertile source of litigation.

Robinson quotes 26 CFR 20.2031–1, in contending that the Regulations require consideration of "[a]ll relevant factors and elements of value".[8] Those factors, says Robinson, should include the state of Decedent's health. Section 20.2031–1, however, deals with valuation of property generally, and resort to its principles is proper only in valuing property not specifically described

---

7. Nor would Robinson prevail if he had shown the regulations unwise or burdensome or inferior. *Commissioner v. South Texas Lumber Co.,* 333 U.S. 496, 68 S.Ct. 695, 92 L.Ed. 831 (1948); *Bingler v. Johnson,* 394 U.S. 741, 89 S.Ct. 1439, 22 L.Ed.2d 695 (1969).

8. § 20.2031–1 *Definition of gross estate; valuation of property.*

. . . . .

(b) *Valuation of property in general.* The value of every item of property includible in a

decedent's gross estate under sections 2031 through 2044 is its fair market value at the time of the decedent's death, except that if the executor elects the alternate valuation method under section 2032, it is the fair market value thereof at the date, and with the adjustments, prescribed in that section. . . . *All relevant facts and elements of value as of the applicable valuation date shall be considered in every case. . . .* [Emphasis added]

in §§ 20.2031–2 through 20.2031–8.[9] A decedent's reversionary interest being specifically described in § 20.2031–7, that section is controlling in the valuation of that interest.[10]

The Commissioner, in evaluating Decedent's reversionary interest, acted in conformity with established Treasury Regulations. Beginning at 26 CFR 20.2037–1, the regulations provide in applicable part:

§ 20.2037–1 *Transfers taking effect at death.*

. . . . .

(c) *Retention of reversionary interest.*

(3) For purposes of this section, the value of the decedent's reversionary interest is computed as of the moment immediately before his death, . . . without regard to the fact of the decedent's death. The value is ascertained in accordance with recognized valuation principles for determining the value for estate tax purposes of future or conditional interests in property. (See §§ 20.2031–1, 20.2031–7, and 20.2031–9). For example, if the decedent's reversionary interest was subject to an outstanding life estate in his wife, his interest is valued according to the actuarial rules set forth in § 20.2031–7. On the other hand, if the decedent's reversionary interest was contingent on the death of his wife without issue surviving and if it cannot be shown that his wife is incapable of having issue (so that his interest is not subject to valuation according to the actuarial rules in § 20.2031–7), his interest is valued according to the general rules set forth in § 20.2031–1. . . .

The language of § 20.2037–1 clearly directs that valuation of Decedent's reversionary interest should be determined according to the procedure set forth in § 20.2031–7, providing in applicable part:

§ 20.2031–7 *Valuation of annuities, life estates, terms for years, remainders and reversions for estates of decedents dying on or before December 31, 1970.*

(a) *In general.* . . .

(2) . . . If the interest to be valued is dependent upon more than one life or there is a term certain concurrent with one or more lives, see paragraph (e) of this section . . . .

. . . . .

(e) *Actuarial computations by the Internal Revenue Service.* If the valuation of the interest involved is dependent upon the continuation or the termination of more than one life or upon a term certain concurrent with one or more lives, a special factor must be used. The factor is to be computed upon the basis of the Makehamized mortality table appearing as Table 38 of United States Life Tables and Actuarial Tables 1939–1941, published by the United States Department of Commerce, Bureau of Census, and interest at the rate of 3½ percent a year, compounded annually . . . .

The method of valuation used by the Commissioner in computing the value of Decedent's reversionary interest, that is, the exclusive use of Table 38 life expectan-

---

**9.** § 20.2031–9. *Valuation of other property.* The valuation of any property not specifically described in §§ 20.2031–2 through 20.2031–8 is made in accordance with the general principles set forth in § 20.2031–1. For example, a future interest in property not subject to valuation in accordance with the actuarial principles set forth in § 20.2031–7 is to be valued in accordance with the general principals set forth in § 20.2031–1.

**10.** Robinson says that the Commissioner has considered the impaired state of health of an individual in valuing charitable remainders citing *Estate of Nellie H. Jennings,* 10 T.C. 323 (1948) and *Huntington National Bank,* 13 T.C. 760 (1949), in valuing marital deductions citing

*Estate of John P. Hoelzel,* 28 T.C. 384 (1957) and in valuing credits for taxes paid on prior transfers, Rev.Rul. 66–307 and should therefore consider health here. The valuation questions in those instances did not arise under § 2037, but under § 2055, relating to charitable transfers, § 2056, relating to the marital deduction and § 2013, relating to credits for taxes paid on prior transfers. No inconsistency in the Commissioner's treatment of reversionary interests has therefore been shown. Nor is there a requirement that valuation of these interests and reversionary interests be treated identically by the Secretary in formulating appropriate regulations.

cy figures, is the method specifically prescribed by the regulations. § 20.2031–7(a)(2), (e). This method resulted in a valuation of 8.47%. Thus, the trust corpus was properly included in Decedent's gross estate and taxable under § 2037(a)(2).

### Conclusion

The reserved power of appointment provision of the trust instrument was properly construed. The power would become effective if Decedent survived her sons. The Commissioner properly employed Table 38 exclusively in valuing Decedent's reversionary interest for purposes of § 2037. Because the value of that interest exceeded 5%, the trust corpus was properly included in Decedent's taxable estate. Accordingly, the district court's judgment of July 5, 1978, disallowing Robinson's claim for refund, is affirmed.

*AFFIRMED.*