**MANUFACTURERS HANOVER TRUST COMPANY, as Executor of the Estate of Charlotte C. Wallace, Plaintiff-Appellee,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 1334, Docket 84–6051.**

United States Court of Appeals, Second Circuit.

Argued June 15, 1984.

Decided Sept. 16, 1985.

---

Denny Chin, Asst. U.S. Atty., New York City (Rudolph W. Giuliani, U.S. Atty., Thomas D. Warren, Asst. U.S. Atty., New York City, of counsel), for defendant-appellant.

Robert E. Crotty, New York City (Harvey F. Zimand, Richard J. Concannon, Debra M. Aaron, Kelley Drye & Warren, New York City, of counsel), for plaintiff-appellee.

Isabelle Katz Pinzler, Mary L. Heen, Burt Neuborne, American Civil Liberties Union Foundation, New York City, Steven Shapiro, New York Civil Liberties Union, New York City, submitted a brief for amici curiae American Civil Liberties Union, New York Civil Liberties Union, NOW Legal Defense and Educ. Fund, and Women's Legal Defense Fund.

Before VAN GRAAFEILAND, NEWMAN and PRATT, Circuit Judges.

GEORGE C. PRATT, Circuit Judge:

The question presented in this appeal by the United States from the summary judgment in *Manufacturers Hanover Trust Co. v. United States*, 576 F.Supp. 837 (S.D. N.Y.1983), Charles E. Stewart, *Judge*, is whether the Internal Revenue Service's use of gender-based mortality tables to value reversionary interests of a decedent's estate under 26 U.S.C. § 2037 violates the equal protection guaranteed by the due process clause of the fifth amendment. The IRS, following regulations in effect from 1970 to 1983, used gender-based mortality tables to calculate the estate tax owed by plaintiff Manufacturers Hanover Trust Company, as executor of the estate of Charlotte C. Wallace. The district court held that the IRS practice was unconstitutional, and it therefore awarded plaintiff a tax refund of $455,581.71 plus interest.

We reverse. Although the challenged IRS practice did distinguish between males and females, the gender classification was substantially related to the important governmental objective of promoting equity and fairness in estate taxes by accurately valuing reversionary interests. The challenged practice lacks those characteristics that make gender classifications invidious. There is no evidence that the challenged practice distributes burdens or benefits in a way that disadvantages the class of women as a whole, or that disadvantages the class of men as a whole. The gender classification does not demean the ability or social status either of women or of men, and it is not based on assumptions that women or men will choose stereotyped or traditional social roles. The gender-based mortality tables realistically reflect the fact that men and women have different average life expectancies, and the government's use of these averages for determining values in estate taxation does not create an unacceptable risk of discriminating against those who are not within the statistical norm. In light of all these circumstances, there is nothing unconstitutional about the challenged practice.

BACKGROUND

On November 5, 1923, Charlotte C. Wallace established a trust that provided income to her for her life and, on her death, income to her son, Howard. The corpus of the trust would pass by the terms of Howard's will if he outlived his mother, but by the terms of Charlotte's will if he predeceased her. Charlotte died on February 28, 1976, at the age of 88; she was survived by Howard, who was then 57 years old. The estate tax law provides that if the value of a decedent's reversionary interest in a trust immediately before death exceeds 5 percent of the trust's value, then the trust corpus must be included in the gross estate. 26 U.S.C. § 2037(a)(2) (1982).

Charlotte's executor calculated the value of her reversionary interest at 4.9867 percent, using Unisex Table 1 of the *United States Life Tables: 1959-61*, published by what was then known as the United States Department of Health, Education and Welfare. Because the value fell below the statutory 5 percent cutoff, the estate paid no tax on the trust corpus.

The Treasury regulations in effect at the time of Charlotte's death, however, required the value of a reversionary interest in a trust to be computed according to gender-based mortality tables. *See* Treas. Reg. §§ 20.2031–7(a), 20.2031–10(d), (e), (f), 20.2037–1(c)(3); Rev.Rul. 66–307, 1966–2 Cum.Bull. 429. Using gender-based tables, IRS calculated the value of the reversionary interest at 6.654 percent and assessed the estate with an aggregate deficiency, plus additions, of $458,662.98.

The estate paid the deficiency and, after an administrative claim for a refund was denied, filed this refund suit. The district court granted the estate's motion for summary judgment, 576 F.Supp. 837 (S.D.N.Y. 1983), holding that use of gender-based mortality tables violated the equal protection component of the fifth amendment. This appeal followed.

### Discussion

"Statutory classifications that distinguish between males and females are 'subject to scrutiny under the Equal Protection Clause.'" *Craig v. Boren,* 429 U.S. 190, 197, 97 S.Ct. 451, 456, 50 L.Ed.2d 397 (1976) (quoting *Reed v. Reed,* 404 U.S. 71, 75, 92 S.Ct. 251, 253, 30 L.Ed.2d 225 (1971)). "To withstand constitutional challenge * * * classifications by gender must serve important governmental objectives and must be substantially related to achievement of these objectives." *Craig v. Boren,* 429 U.S. at 197, 97 S.Ct. at 456. In the present case the government argues, first, that the challenged statutory scheme does not treat men and women differently, and second, that even if the statutory scheme does treat men and women differently, the differences in treatment are justified and not invidious. We find the arguments supporting the first point to be unpersuasive, but on the second point we agree with the government that there is nothing invidious or unjustified in the way this particular statutory scheme makes use of distinctions between men and women.

### A. *Are similarly situated men and women treated differently because of classification by gender?*

The government argues that the IRS practice does not treat men and women differently because "[u]nder the 5 percent rule of section 2037, the estates of decedents of both sexes are includable, and trusts established for the benefit of members of both sexes are taxable. The key is not the grantor's or the grantee's sex, but the value of the grantor's reversionary interest."

This argument is unconvincing. While it is true that estates of both male and female decédents are includable under the rule, and that trusts may be taxed whether their beneficiaries are men or women, nevertheless, what the government calls the "key" of section 2037—the value of the grantor's reversionary interest—is determined by calculations that treat similarly situated men and women differently. As a result the amount of the estate tax will sometimes depend upon whether the decedent or beneficiary is male or female. This comes about in the following way.

For purposes of the estate tax, the value of the grantor's reversionary interest in a trust requires calculating the probability that a person at the age of the grantor, just prior to death, would outlive the trust's beneficiary. The figures on life expectancies come from standard mortality tables, and gender-based tables reflect the undisputed fact that, on the average, women live longer than men at every age. This statistical fact then affects the calculation of a reversionary interest in two ways.

First, when gender-based tables are used, the likelihood that a female trust settlor will outlive her beneficiary is greater than the likelihood that a male trust settlor in similar circumstances will outlive his beneficiary. (Similar circumstances, for present purposes, occur when the male trust settlor's beneficiary is the same age and gender as the female trust settlor's beneficiary.) Therefore, when gender-based tables are used in calculating the estate tax, the fact that the decedent is

female will increase the value of the reversionary interest over what that value would be if the decedent were male.

A second effect of using gender-based tables comes from the role played by the life expectancy of the beneficiary. When gender-based mortality tables are used, the likelihood that a female beneficiary will outlive her trust settlor is greater than the likelihood that a male beneficiary in similar circumstances will outlive his trust settlor. (Similar circumstances occur here when the male beneficiary's trust settlor is the same age and gender as the female beneficiary's trust settlor). When gender-based tables are used, therefore, the fact that the beneficiary is female will decrease the value of the reversionary interest from what it would be if the beneficiary were male.

It is therefore possible that in certain circumstances the sex of the decedent or of the beneficiary will determine whether or not the value of the reversionary interest exceeds the 5 percent of the trust corpus that requires the trust to be included as part of the gross taxable estate. The effect of using gender-based tables is illustrated in the following table, which shows the percent to be used for calculating the value of a reversionary interest in a trust created by a person who died at Charlotte's age with a beneficiary at Howard's age.

| Decedent Age 88 | Beneficiary Age 57 | Percent Resulting From Gender-Based Tables |
|---|---|---|
| Female | Male | 6.654 |
| Male | Male | 6.415 |
| Female | Female | 3.520 |
| Male | Female | 3.390 |

The table demonstrates that whatever the sex of the beneficiary, the value of a reversionary interest is greater for a female *decedent* (6.654% with male beneficiary and 3.520% with female beneficiary) than for a similarly situated male decedent (6.415% for male beneficiary and 3.390% for female beneficiary). Similarly, whatever the sex of the decedent, the value of a reversionary interest is less with a female *beneficiary* (3.390% with male decedent and 3.520% with female decedent) than with a similarly situated male beneficiary (6.415% with

male decedent and 6.654% with female decedent). The table also shows that if Howard had been female instead of male, the trust would not have been included in the taxable estate because the value of the reversionary interest would have been 3.520 percent of the trust corpus.

It is apparent, therefore, that under the IRS practice of using gender-based mortality tables, similarly situated men and women are treated differently in a way that may affect the taxpayer's ultimate tax burden. This constitutes discrimination based on gender.

In arguing against this conclusion, the government claims that the challenged regulations do not discriminate because "the tax here is assessed against an estate, a legal fiction that is separate and distinct from the decedent and that lacks any gender. It is a tax not on an individual * * ". However, the mere fact that the taxed entity is an estate does not make it impossible for that tax to discriminate against men or women. The estate represents the legal interests of the decedent and the decedent's beneficiaries, who may be individual men or women. When an estate pays a tax, there is an obvious practical impact on the beneficiaries: the higher the tax, the less the estate has to distribute to the beneficiaries. There is also an impact on the decedent, since the higher the estate tax the less the decedent can benefit, through her estate, those she wishes to benefit. Estates and the laws governing them are a means of channeling effects upon individuals, and taxes on estates are just as capable, in principle, of discriminating against men or women as a tax on individuals. On a substantive level, therefore, there is no difficulty in challenging an estate tax on the ground that it discriminates against men or women. As for standing, perhaps the challenge cannot be brought except by an executor of the estate suing after death has occurred and the controversy concerning the allegedly discriminatory tax has ripened, but there can be no doubt that this is the type of contention that may be advanced by an executor.

*Cf. NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958); *Barrows v. Jackson,* 346 U.S. 249, 73 S.Ct. 1031, 97 L.Ed. 1586 (1953); *Pierce v. Society of Sisters,* 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925).

The government also argues that in the present case the challenged regulations cannot be found to discriminate on the basis of gender because the corpus of Charlotte's trust would have been includable in the estate even if she had been male. As the table given above shows, if Charlotte had been male the value of her reversionary interest would have been 6.415 percent, and since that value is above the 5 percent statutory cut-off, the trust would still have been included as part of the taxable estate. This shows, the government claims, that in this case there is no dissimilar treatment that could count as discrimination.

The reasoning here is flawed in two ways. First, the argument ignores the beneficiary. The gender classifications that affect the estate tax involve Howard as well as Charlotte. If Howard had been female instead of male, the value of the reversionary interest would have been less than 5 percent and therefore not taxable, regardless of the sex of the decedent. The estate can thus claim injury because of the dissimilar treatment of male and female beneficiaries.

The second flaw in the government's argument is that it ignores the consequence in this case of the IRS practice of using gender-based mortality tables instead of gender-neutral tables. If a gender-neutral table were used to calculate the value of Charlotte's reversionary interest her estate would not have to pay the contested tax. For a decedent age 88 and a beneficiary age 57, the value of a decedent's reversionary interest, calculated by gender-neutral tables, would be 4.9867 percent of the trust corpus no matter what the sex of the decedent or beneficiary. Thus, the basic IRS decision to treat men and women differently by using gender-based mortality tables directly burdens the estate in a way it would not be burdened if the IRS had ignored gender.

In short, it does not matter that the challenged practice calculates the reversionary interest at greater than 5 percent of the trust whether Charlotte was male or female, because the practice still treats men and women differently, and the basic decision to use a system that takes gender into account, rather than one which does not, demonstrably burdens this estate.

B. *Is the gender classification invidious?*

█ Classifications distinguishing between males and females are justified under the constitution if they are substantially related to important governmental objectives. *Craig v. Boren,* 429 U.S. at 197, 97 S.Ct. at 456. This test imposes a lower standard than the "strict scrutiny" test used for classifications such as race, which requires that a classification be "necessary" to further a "compelling" government interest, but it imposes a higher standard than the minimal rationality test traditionally required for legislative classifications not involving either gender or an "inherently suspect" categorization. *See Michael M. v. Superior Court of Sonoma County,* 450 U.S. 464, 468–69, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (1981); Freedman, *Sex Equality, Sex Differences, and the Supreme Court,* 92 Yale L.J. 913, 926 n. 57 (1983).

Contrary to the government's position, we do not apply the minimal rationality standard just because the case involves federal estate taxation. To support its claim that the standard should be one of minimal rationality, the government cites primarily equal protection challenges to tax regulations that did not involve gender discrimination. *E.g., Regan v. Taxation with Representation,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *Madden v. Kentucky,* 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940); *Burke Mountain Academy, Inc. v. United States,* 715 F.2d 779 (2d Cir.1983). We find this authority unpersuasive.

Neither are we persuaded by *Kahn v. Shevin*, 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974), to accept the government's position on the correct standard of review. *Kahn* involved an equal protection challenge to a state law giving a property tax exemption to widows but not to widowers, and the Court's opinion does say that "[a] state tax law is not arbitrary although it 'discriminate[s] in favor of a certain class * * * if the discrimination is founded upon a reasonable distinction, or difference in state policy,' not in conflict with the Federal Constitution." *Id.* at 355, 94 S.Ct. at 1737 (quoting *Allied Stores v. Bowers*, 358 U.S. 522, 528, 79 S.Ct. 437, 441, 3 L.Ed.2d 480 (1959)). But *Kahn* also held that the challenged law was justified because it had "a fair and substantial relation to the object of the legislation", *Kahn* 416 U.S. at 355, 94 S.Ct. at 1737 (quoting *Reed v. Reed*, 404 U.S. 71, 76, 92 S.Ct. 251, 254, 30 L.Ed.2d 225 (1971) (quoting *Royster Guano Co. v. Virginia*, 253 U.S. 412, 415, 40 S.Ct. 560, 561, 64 L.Ed. 989 (1920))), and the Court took great care to show the importance of the law's objective of remedying past gender discrimination. This suggests that the standard applied in *Kahn* is no different than the general standard the Court has applied in subsequent cases, such as *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), which requires that the classification by gender be substantially related to an important governmental objective.

In the present case the government claims that its objective in using gender-based mortality tables is accuracy in valuing reversionary interests, and that this increased accuracy promotes equity and fairness in imposing tax burdens. We agree that this is an important governmental objective, and the record before us presents no reason to doubt that the challenged practice actually was adopted with the intention of promoting that objective, and without intent to discriminate against either men or women.

When the federal estate tax was first enacted in 1916, all property subject to a transfer "intended to take effect in posses-sion or enjoyment at or after [the transferor's] death" was includable in the transferor's gross estate. Internal Revenue Code of 1916, § 202(b), ch. 463, 39 Stat. 778 (1916). This rule was taken to its extreme in *Estate of Spiegel v. Commissioner*, 335 U.S. 701, 69 S.Ct. 301, 93 L.Ed. 330 (1949), when the Supreme Court included a $1,140,000 trust in the settlor's gross estate even though the value of the settlor's reversionary interest was approximately $70. In response, Congress enacted what has been codified as 26 U.S.C. § 2037(a), which embodies the policy judgment that when the value of a reversionary interest falls below 5 percent of a trust, it is not sufficiently significant to require that the trust be included in the gross estate for tax purposes. *See* 1949 U.S.Code Cong.Serv., 81st Cong., 1st Sess., 2171, 2185.

The use of gender-based tables to calculate the value of reversionary interests was adopted in 1970 "in the interest of greater actuarial accuracy." Memorandum accompanying notice of proposed change to male-female tables, June 11, 1970, from Randolph Thrower, IRS Commissioner, to Edwin S. Cohen, Asst. Sec. of the Treas. (available in Memos file of Fedtax library of Lexis under the search term "LR 1719"). The rationale was that gender-based tables provide a more accurate measure of average life expectancies, and that the more accurate the measure of those averages, the fairer and more equitable the tax impositions.

■ Since we find no fault with the objective of the challenged practice, its constitutionality turns on whether that practice is "substantially related" to that objective. While there is no mechanical test for determining whether or not a practice satisfies the substantial relationship test, case law does make it clear that at least four particular matters must be explored and weighed: (1) aggregate impact on class; (2) demeaning generalizations; (3) stereotyped assumptions; and (4) flawed use of statistics. Consideration of these four factors in the present case convinces us that there is

nothing invidious about the IRS's use of gender-based mortality tables for purposes of § 2037(a).

### 1. *Aggregate impact on class.*

■ In deciding whether the substantial relationship test is satisfied, it is relevant whether the classification disadvantages all members of a particular sex, or whether it distributes benefits and burdens to both sexes equally. In *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), the Supreme Court rejected a claim of gender discrimination because the class of those benefitting from the challenged statute included both women and men, so that "[t]he fiscal and actuarial benefits of the [challenged] program thus accrue to members of both sexes". *Id.* at 496–97 n. 20, 94 S.Ct. at 2492 n. 20. The statute challenged in *Geduldig* arguably involved gender classification because it excluded pregnancy from a list of compensable disabilities. The Court upheld the statute, however, because "the aggregate risk protection" provided by the statutory disability program did not disadvantage the class of all women as compared to the class of all men. *Id.* at 496–97, 94 S.Ct. at 2491–92. When discrimination on the basis of gender has been found to violate the constitution, it has always been the case that the directly affected women (or men) as a class were disadvantaged.

In the present case, there has been no showing that the challenged practice disadvantages the class of all directly affected women as compared to the class of all directly affected men. In some situations the IRS practice places a directly affected woman in a worse position than a similarly situated man, but at other times the practice places a directly affected woman in a better position than a similarly situated man. Moreover, nothing indicates that the overall distribution of comparative advantages and disadvantages favors one sex over the other.

The challenged practice places female decedents in worse positions than similarly situated male decedents because the value of the reversionary interest will be greater when the decedent is female than when the decedent is male, both in the case where the beneficiary is male and in the case where the beneficiary is female. This shows that at least one subclass of directly affected women—female decedents—may be burdened in a special way by the IRS practice. But it does not show that the class of women as a whole is burdened any differently from the class of men, because female decedents are not the only women directly affected by the IRS practice. Female beneficiaries are also directly affected, and the IRS practice actually benefits them, in comparison to similarly situated men. The value of the reversionary interest when the beneficiary is female is always lower than the value when the beneficiary is male, as the table set out earlier illustrates. Thus the IRS practice places female beneficiaries in better positions than male beneficiaries.

This kind of patchwork distribution of relative advantages and disadvantages is not the common pattern found in gender discrimination suits, and by itself it does not show unconstitutional discrimination. The Supreme Court did find in one case, *Wengler v. Druggists Mutual Insurance Co.*, 446 U.S. 142, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980), that a challenged practice unconstitutionally discriminated against both men and women. The law held unconstitutional in *Wengler* provided that workers' compensation death benefits would be paid to a widow regardless of whether she could prove actual dependence on her husband's earnings, but that a widower would receive death benefits only if he proved actual dependence on his wife's earnings or was incapacitated from wage earning. The law directly affected both widows and widowers, and widowers were directly burdened in a way that similarly situated widows were not. Any discriminatory burden suffered by women was, therefore, only the consequence of the direct burden placed in the first instance on their husbands; that direct burden, moreover, was placed on all husbands, and there was no subclass of men who received any direct

advantage from the challenged practice. The effects of the law rejected in *Wengler*, therefore, are unlike the effects of the tax law at issue in the case now before us.

A law which distributes direct benefits and burdens to both men and women might still be troubling if that distribution were not equal, so that one sex would be unduly favored at the expense of the other. In the present case, however, there is simply no evidence of such inequality, since there is nothing to show either that the challenged IRS practice places a greater aggregate estate tax burden on the class of all women than on the class of all men, or that it places a greater aggregate burden on the class of all men than on the class of all women.

### 2. *Demeaning generalizations.*

Distribution of burdens or benefits which otherwise appear equal might still be objectionable because they are based on classifications which demean the ability or social status of men or of women. A legislature "is not free to make overbroad generalizations based on sex * * * which demean the ability or social status of the affected class." *Parham v. Hughes*, 441 U.S. 347, 354, 99 S.Ct. 1742, 1747, 60 L.Ed.2d 269 (1979). However, this is not a concern in the present case.

### 3. *Stereotyped assumptions.*

■ Under the Supreme Court decisions of the early 1970's which first established gender discrimination as a part of constitutional law, *see Reed v. Reed*, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225 (1971); *Frontiero v. Richardson*, 411 U.S. 677, 93 S.Ct. 1764, 36 L.Ed.2d 583 (1973); *Weinberger v. Weisenfeld*, 420 U.S. 636, 95 S.Ct. 1225, 43 L.Ed.2d 514 (1975); *Stanton v. Stanton*, 421 U.S. 7, 95 S.Ct. 1373, 43 L.Ed.2d 688 (1975), it is significant if the gender classification is based on stereotyped or traditional assumptions about social roles. Arguments that women or men "naturally" incline towards, or are "naturally" suited for, "traditional" social roles, are flawed because of their self-fulfilling character.

The classifications themselves often discourage the very experimentation with social roles that would prove the traditional assumptions to be wrong. As with demeaning generalizations, however, this kind of classic discrimination is not at issue in the present case.

### 4. *Flawed use of statistics.*

■ Satisfying the substantial relationship test will prove difficult to the extent that the gender classification is based on statistical generalizations that are unreliable, that show only weak correlations, or that are flawed in other ways. In *Craig v. Boren*, 429 U.S. 190, 97 S.Ct. 451, for example, shortcomings in statistics required the invalidation of an Oklahoma law which prohibited men from drinking 3.2 percent beer until the age of 21, but which allowed women to drink 3.2 percent beer at age 18. The statistics offered in support of the difference in treatment of men and women showed that only .18 percent of females who were 18 to 20 years old were arrested for alcohol-related driving offenses, whereas 2 percent of males age 18 to 20 were arrested for those offenses. *Id.* at 201, 97 S.Ct. at 458–9. A roadside random survey also found a blood alcohol concentration greater than .01 percent in 14.6 percent of males and 11.5 percent of females. *Id.* at 203 n. 16, 97 S.Ct. at 460 n. 16. The Supreme Court rejected the state's defense, holding that a correlation of 2 percent between drinking and driving "must be considered an unduly tenuous 'fit' ", *id.* at 202, 97 S.Ct. at 459, and that the roadside survey disparities between the sexes were not substantial. *Id.* at 203 n. 16, 97 S.Ct. at 460 n. 16.

In contesting the significance of gender-based mortality statistics, appellee in the present case points to the fact that, for a group of males and females chosen at random, more than 80% of all the female deaths could be matched with the deaths of males of the same age. *See* Bergman & Gray, *Equality in Retirement Benefits*, Civ. Rights Dig., Fall 1975, at 25. It was this fact, apparently, that led Judge Stew-

art to say in this case that "only 20% of all women actually do outlive men", 576 F.Supp. at 842, and to conclude, therefore, that gender-based mortality tables could not be used because their use results in discrimination against those who do not fit the statistical norm. His reasoning was that the equal protection component of the fifth amendment is concerned with individual rights, and that those who do not fit a statistical norm based on gender should not have their individual situations measured by gender-based group averages or composites.

This reasoning has an initial plausibility because of its similarity, or apparent similarity, to the reasoning used by the Supreme Court in *City of Los Angeles, Dep't of Water v. Manhart*, 435 U.S. 702, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978). In *Manhart* a city department had required its female employees to make monthly payments to its pension fund which were 14.84% higher than the monthly payments required of male employees. The city department justified this practice by claiming that gender-based mortality tables showed that women lived longer than men, and that women would therefore receive, on the average, more in retirement benefits than men would. The Supreme Court held that Title VII of the 1964 civil rights act prohibited this use of gender-based statistics because it results in discrimination against individual women who do not fit the statistical norm. "Even a true generalization about the class is an insufficient reason for disqualifying an individual to whom the generalization does not apply." *Id.* at 708, 98 S.Ct. at 1375. "Individual risks, like individual performance, may not be predicted by resort to classifications proscribed by Title VII." *Id.* at 710, 98 S.Ct. at 1376.

The reasoning of *Manhart*, however, is not dispositive of the issue in the present case for three reasons. First, Title VII's standard is not the same as the standard set by the equal protection component of the fifth amendment. Title VII gives sex discrimination the same level of scrutiny it gives to race discrimination; the stat-

utory language forbidding sex discrimination and race discrimination is the same, except for a few differences in defenses and a separate section on pregnancy. The constitution, however, imposes only an intermediate level of scrutiny for sex discrimination, while requiring that race discrimination be subject to strict scrutiny. *Michael M. v. Superior Court of Sonoma County*, 450 U.S. 464, 468–69, 101 S.Ct. 1200, 1204, 67 L.Ed.2d 437 (1981). Proving a violation of Title VII's prohibition on discrimination does not require proving that the discrimination was intentional; proving a violation of the constitutional prohibition against discrimination does require proving that the discrimination was intentional. *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977). For these reasons, it cannot be assumed that every form of gender classification forbidden by Title VII is also forbidden by the constitution.

Second, in *Manhart* every directly affected woman was burdened by the challenged practice. In the present case, as explained above, some women are benefitted by the challenged practice, as compared to similarly situated men, and there has been no showing that the class of women as a whole is subject to a burden any different from the burden placed on the class of men as a whole.

Third, the relationship in *Manhart* between gender-based statistics and predictions of individual life expectancy is not the same as that relationship in the present case. In *Manhart* the justification for requiring higher payments from any individual woman was that she, as an individual, had an expectation of living longer than a man at the same age, and that she therefore had an expectation of receiving a larger aggregate of benefits over the course of her pension years. In the present case the IRS is not using gender-based statistics to establish that the individual settlor has an actual expectation of outliving his or her beneficiary. When the estate tax becomes an issue the settlor is already dead. In a

great number of cases, moreover, the actual life expectancy of the trust settlor just prior to death will be close to zero. Indeed, if the tax code were concerned with the actual market value of individual reversionary interests as measured by the individual's actual situation, rather than a theoretical value as measured by some statistical average, then the reversionary interest would rarely be included in a decedent's gross estate.

The estate tax is concerned, in fact, with something different. The goal of the estate tax in this matter is a fair and accurate determination of a special kind of average value of reversionary interests. Congress, through its statutes and the regulations implementing them, has determined that a fair way of valuing reversionary interests after a decedent's death is to use the average life expectancies of settlors and beneficiaries. It chose to reject individualized determinations, and aimed instead at making the tax burden fair across groups of settlors and beneficiaries. We cannot say that this choice to look to averages, rather than to individual situations or to some actual market for individual reversionary interests, is illegitimate.

The statistical "fit" that matters in this case, then, is accuracy of averages. In this special situation where there has been a legitimate choice to define value in terms of average life expectancies, rather than in terms of the best individualized approximation of a particular person's actual life expectancy, there is a great deal to be said for using gender-based mortality tables because they do, in fact, give more accurate averages of life expectancies than do gender-neutral tables. Our conclusion is that this case does not present the same kind of danger of unjustified discrimination against individuals as was found in *Manhart*. The estate tax's use of the more accurate averages in gender-based tables does not discriminate against individuals.

## CONCLUSION

Given the special set of circumstances present in this case, we think that the increased accuracy of gender-based tables constitutionally justifies their use. The challenged practice distributes comparative benefits to both men and women, and distributes comparative burdens to both men and women. There has been no showing of any disparate impact on the class of women as a whole, or on the class of men as a whole. The classifications do not demean either gender, and they are not based on stereotyped assumptions about the social roles men or women might choose. Finally, the method of valuing reversionary interests for tax purposes focuses, with constitutional legitimacy, on averages, and gender-based mortality tables do provide more accurate averages. We find nothing unconstitutional in the challenged practice.

We therefore reverse.

JON O. NEWMAN, Circuit Judge, dissenting:

This appeal presents an apparently novel equal protection issue in the area of gender discrimination. The issue is whether the use of gender-based mortality tables to value reversionary interests for estate tax purposes denies female decedents the equal protection of the laws. The Government seeks to uphold this use of gender-distinct tables on two grounds: The tables do not discriminate on the basis of gender and, even if they do, the discrimination is not unconstitutional. I agree with the majority, though for different reasons, that the first argument is unavailing, but I respectfully dissent because I conclude that the second argument also fails. Both contentions merit extended discussion.

### I.

### Is There Gender Discrimination?

The Government contends that there has been no gender discrimination against the female decedent. There are two aspects to this contention. First, the Government points out that if the decedent had been a male, her estate would still have been liable for tax upon the trust corpus. Second, the Government argues that whether a trust is

includable in a decedent's estate depends on a variety of factors—the age of the decedent at death, the age of the beneficiary at the decedent's death, the gender of the decedent, and the gender of the beneficiary. Recognizing that there is "some reliance on male-female mortality data," the Government maintains that there is "no disparate treatment of groups on the basis of that data" and "no classification or creation of groups solely identifiable by sex." Brief for Appellant at 15.

Before considering these specific arguments, I acknowledge my agreement with a basic premise that underlies each of them—a government practice does not constitute gender discrimination unless it burdens a class identified solely on the basis of gender. That premise was at the core of the Supreme Court's decision in *Geduldig v. Aiello*, 417 U.S. 484, 94 S.Ct. 2485, 41 L.Ed.2d 256 (1974), rejecting a gender-discrimination challenge to a state's exclusion of pregnancy from coverage under a disability insurance program:

> The lack of identity between the excluded disability and gender as such under this insurance program becomes clear upon the most cursory analysis. The program divides potential recipients into two groups—pregnant women and nonpregnant persons. While the first group is exclusively female, the second includes members of both sexes. The fiscal and actuarial benefits of the program thus accrue to members of both sexes.

*Id.* at 496–97 n. 20, 94 S.Ct. at 2492 n. 20. *See Personnel Administrator v. Feeney*, 442 U.S. 256, 271–74, 99 S.Ct. 2282, 2291–93, 60 L.Ed.2d 870 (1979); *Parham v. Hughes*, 441 U.S. 347, 352–57, 97 S.Ct. 451, 50 L.Ed.2d 397 (1979). Successful equal protection challenges based on gender discrimination have involved practices that burdened a class identified solely by gender. *E.g., Mississippi University for Women v. Hogan*, 458 U.S. 718, 102 S.Ct. 3331, 73 L.Ed.2d 1090 (1982); *Craig v. Boren*, 429 U.S. 190, 99 S.Ct. 1742, 1746–48, 60 L.Ed.2d 269 (1976).

A. *The effect on the decedent.* The present value of the decedent's reversionary interest in the trust just prior to her death, calculated on the basis of gender-distinct mortality tables, was 6.654% of the trust corpus. If the decedent had been a male, the present value of the reversionary interest, calculated in the same way, would have been 6.415% of the trust corpus. The Government argues that since both percentages are greater than the 5% threshold figure at which a trust corpus is includable in the decedent's gross estate, there has been no gender discrimination against Charlotte Wallace; her trust was not included in her gross estate because of her gender.

That argument carries the premise of *Geduldig* far beyond its legitimate scope. It is one thing to say, as the Court did in *Geduldig*, that a practice constitutes a gender-based discrimination only when it disadvantages a class identified solely on the basis of gender. It is quite another thing to say, as the Government urges here, that a challenged practice does not disadvantage a class identified solely on the basis of gender because some members of the class, including the decedent, are not *sufficiently* disadvantaged to suffer adverse consequences at the precise level at which the Government has elected to attach such consequences. In some cases, the absence of adverse consequences may defeat standing for a particular plaintiff, but it does not show the absence of a gender-based discrimination. For example, if a government employer awarded five extra points to all males who took a civil service examination and hired all persons who passed, that practice would be a gender-based discrimination against females, regardless of what score the employer selected as a passing grade.

The challenged practice in this case—use of gender-distinct mortality tables—produces a disadvantage to a class identified solely on the basis of gender: The reversionary interest of every female decedent is valued higher than the reversionary inter-

est of every similarly situated male.[1] Since the higher the present value of the reversionary interest, the more likely that the trust will be included in the decedent's gross estate and therefore taxed, the existence of the 5% dividing line does not defeat the claim of gender-based discrimination. Nor is standing defeated in this case by the fact that, with gender-distinct tables in use, the decedent's trust would have been included in her gross estate even if she had been a male. Her executor is presenting the claim that the Government has violated equal protection requirements by using gender-distinct mortality tables instead of a unisex table. Since the decedent's trust would not have been included in her gross estate if a unisex table had been used, the executor plainly has standing to make this claim.

B. *The effect on the class of female decedents.* Determining whether the use of gender-distinct mortality tables is a gender-based discrimination against the class of female decedents is complicated by the formula for calculating the present value of a decedent's reversionary interest. The formula calls for calculation of the probability that a person at the age of the decedent, just prior to death, will outlive the beneficiary of the decedent's trust. The present value of the reversionary interest is thus a function of the life expectancies of both the decedent and the beneficiary of the trust, estimated on the basis of their ages just prior to the decedent's death. Though it is undisputed that women as a class live *on the average* longer than men as a class, the use of gender-distinct mortality tables reflecting this statistical fact has conflicting effects upon the calculation of the present value of a reversionary interest because of the following circumstances. The ages and consequent life expectancies of both the decedent and the beneficiary affect that value. Whatever increases the predicted life expectancy of the trust settlor *increases* the likelihood that the settlor will outlive the beneficiary; on the other hand, whatever increases the predicted life expectancy of the beneficiary *decreases* the likelihood that the settlor will outlive the beneficiary. Gender-based tables yield higher life expectancies for females than for males at every age. Therefore, when such tables are used, the female gender of the *decedent* increases the present value of the reversionary interest, but the female gender of the *beneficiary* decreases the present value of that interest.

The situation is further complicated when one compares the outcome under gender-based tables with the outcome under a unisex table. Female decedents with *male* beneficiaries of their trusts will have their reversionary interests valued higher under gender-based tables than under a unisex table and thus will be more likely to have the trusts included in their gross estates. However, female decedents with *female* beneficiaries of their trusts will normally have their reversionary interests valued lower under gender-based tables than under a unisex table and thus will be less likely to have the trusts included in their gross estates.[2] The Government contends that this assortment of results [3] undercuts

1. For purposes of this case, a male and a female decedent are similarly situated if they are the same age and the beneficiaries of their trusts are of the same age and gender.

2. In those infrequent instances where the beneficiary is older than the decedent (and both are female), the reversionary interest of the decedent will be valued lower under a unisex table than under gender-based tables. For an older female beneficiary, the switch to a unisex table yields a lesser reduction in the life expectancy of a younger female decedent, thereby decreasing the likelihood that a person of the decedent's age would have survived the beneficiary.

3. The variety of possible results is illustrated in the following table, which shows the percent to be used for calculating the present value of a reversionary interest of a trust created by a person who died at Charlotte's age with a beneficiary at Howard's age:

| Decedent | Beneficiary | *Percent Resulting From Gender-Distinct Tables* |
|---|---|---|
| Female aged 88 | Male aged 57 | 6.654% |
| Male aged 88 | Male aged 57 | 6.415% |
| Female aged 88 | Female aged 57 | 3.520% |
| Male aged 88 | Female aged 57 | 3.390% |

the claim that the IRS regulations discriminate on the basis of gender.

It is clear that female decedents are not uniformly worse off when gender-based tables are used than when a unisex table is used for calculating the present value of a reversionary interest. However, it is also true that the present value of the reversionary interest of every decedent, calculated under gender-distinct tables, is *always* higher when the decedent is a female than when the decedent is a male. These two facts require consideration of the issue, rarely presented in discrimination cases, whether the pertinent comparison for equal protection purposes is between the treatment of a class under the challenged practice and the treatment of that class under a neutral practice, or between the treatment of a class under the challenged practice and the treatment of all others similarly situated under the challenged practice. This issue normally does not arise in discrimination cases because a gender-based practice that disadvantages women compared to men will usually also disadvantage women compared to how they would fare under a neutral rule.[4]

Once the analytical issue is clearly in focus, its resolution is clear. For purposes of equal protection analysis, the pertinent inquiry in determining whether a discrimination exists is whether members of a protected class are disadvantaged by the challenged practice compared to similarly situated non-members of the class. Decisions of the Supreme Court have implicitly adopted this view, even though the precise choice we face was not explicitly posed. In *Wengler v. Druggists Mutual Insurance Co.*, 446 U.S. 142, 100 S.Ct. 1540, 64 L.Ed.2d 107 (1980), for instance, the Court invalidated on equal protection grounds a Missouri law that denied a *widower* workers' compensation death benefits on his *wife's* work-related death, unless he either was mentally or physically incapacitated or proved dependence on his wife's earnings, but granted a *widow* death benefits without her having to prove dependence on her *husband's* earnings. The Court recognized that "the statute discriminates against both men and women." *Id.* at 147, 100 S.Ct. at 1543. It discriminated against widowers vis-a-vis similarly situated widows and discriminated against female wage earners vis-a-vis similarly situated male wage earners. The Court did not reject the equal protection claim simply because under the discriminatory law, some women (widows) fared better while others (wage earners) fared worse than they would have fared under a gender-neutral law. The relevant inquiry was how women fared compared to similarly situated men. *See also Califano v. Goldfarb*, 430 U.S. 199, 208, 97 S.Ct. 1021, 1027, 51 L.Ed.2d 270 (1977); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 651–53, 95 S.Ct. 1225, 1234–35, 43 L.Ed.2d 514 (1975).

| Decedent | Beneficiary | Percent Resulting From Unisex Table |
|---|---|---|
| Female aged 88 | Male aged 57 | 4.9867% |
| Male aged 88 | Male aged 57 | 4.9867% |
| Female aged 88 | Female aged 57 | 4.9867% |
| Male aged 88 | Female aged 57 | 4.9867% |

The table illustrates the comparisons noted in the text. Under gender-based tables, the present value percentage is always higher for a female decedent than for a similarly situated male decedent (6.654% versus 6.415%; 3.520% versus 3.390%). Under such tables, the present value percentage is always lower when the beneficiary is female than when the beneficiary is male (3.520% versus 6.654%; 3.390% versus 6.415%). The present value percentage is always higher for a female decedent with a male beneficiary under gender-based tables than under a unisex table (6.654% versus 4.9867%). The present value percentage is always lower for a female decedent with a younger female beneficiary under gender-based tables than under a unisex table (3.520% versus 4.9867%).

4. This case is distinctive, if not unique, because the effects of the gender-based mortality tables enter the calculation of the present value of the reversionary interest twice—once in estimating the life expectancy of the decedent, just before death, and again in estimating the life expectancy of the beneficiary, and because those gender-based effects are augmented or diminished depending on the combination of genders of the two persons involved. When decedents and beneficiaries are of the same gender, the effects tend to cancel each other out; when the genders are different, the effects are amplified.

Since the use of gender-distinct tables causes the present value of the reversionary interests of all female decedents to be higher than the present value of the reversionary interests of all similarly situated male decedents and therefore increases the likelihood that the trusts created by female decedents will be included in their gross estates and consequently taxed, the use of these tables is a discrimination based on gender. Whether that discrimination is unconstitutional under the Equal Protection Clause is a different issue, to which I now turn.

## II.

### Is the Discrimination Unconstitutional?

To withstand constitutional challenge under the equal protection component of either the Fifth or Fourteenth Amendments, regulations that discriminate on the basis of gender must be "substantially related" to the promotion of "important governmental objectives." *Craig v. Boren, supra,* 429 U.S. at 197, 97 S.Ct. at 456.[5] In this case the Government has the burden of demonstrating that the regulations requiring use of gender-based tables in implementing section 2037 meet this standard, for, as the Supreme Court has stated, "[T]he party seeking to uphold a statute that classifies individuals on the basis of their gender must carry the burden of showing an 'exceedingly persuasive justification' for the classification." *Mississippi University for Women v. Hogan, supra,* 458 U.S. at 724, 102 S.Ct. at 3336 (quoting *Personnel Administrator v. Feeney, supra,* 442 U.S. at 273, 99 S.Ct. at 2293).

The Government contends that the "important governmental objective" it seeks to promote by the use of gender-distinct mortality tables is actuarial accuracy in valuing reversionary interests of decedents' trusts. It is the achievement of that objective to which the use of gender-distinct tables must be "substantially related." Since "[a]s a class, women live longer than men," *Los Angeles Department of Water & Power v. Manhart,* 435 U.S. 702, 704, 98 S.Ct. 1370, 1373, 55 L.Ed.2d 657 (1978), there is a surface plausibility to the Government's contention that use of gender-distinct tables is sufficiently related to the objective of promoting actuarial accuracy to justify the gender-based discrimination inherent in such use. Analysis of the Government's contention, however, demonstrates that the requisite justification for using gender-distinct tables is not present in the limited context illustrated by this litigation—the valuation of the reversionary interest of a decedent's trust.

In the first place, it should be noted that the valuation for which gender-distinct tables are used in implementing the 5% cutoff of section 2037 differs significantly from most other purposes for which such tables are used. Typically gender-distinct tables are used to determine the amount of dollars that women as a class and men as a class should pay (or have paid for them by their employer) in order to fund some benefit such as a pension. In that context, the average life expectancies of those in each class determine the amount of dollars that need to be collected to fund the benefit. Whether or not separate calculations of life expectancies for a class of male beneficiaries and a class of female beneficiaries

---

5. The Government argues that, despite the fact that the regulations requiring gender-distinct tables discriminate against women, they should be subjected only to "minimal scrutiny" because they are tax regulations. In support of this contention, the Government cites primarily equal protection challenges to tax regulations that did not involve gender discrimination. *E.g., Regan v. Taxation With Representation,* 461 U.S. 540, 103 S.Ct. 1997, 76 L.Ed.2d 129 (1983); *Madden v. Kentucky,* 309 U.S. 83, 60 S.Ct. 406, 84 L.Ed. 590 (1940); *Burke Mountain Academy, Inc. v. United States,* 715 F.2d 779 (2d Cir.1983).

This authority is unpersuasive. Even *Kahn v. Shevin,* 416 U.S. 351, 94 S.Ct. 1734, 40 L.Ed.2d 189 (1974), which involved gender discrimination, is not dispositive. Unlike *Kahn,* federalism does not require deference to state tax policy in the instant case, and, unlike the statute in *Kahn,* the Treasury regulations at issue here do not employ gender discrimination in order to correct the effects of past gender discrimination. There is no reason to exempt tax regulations from the standard of scrutiny applicable in all other gender discrimination cases.

promote sufficient accuracy, beyond what would be achieved by a unisex table, to justify a gender-based discrimination, the calculations in that context at least determine the valuation of something real—the amount of money needed to fund the benefit. The cost of providing future benefits for a class of females is higher than the cost of promoting the same level of periodic benefits for a class of similarly situated males because the class of females will receive the benefits for a longer period of time. That is the argument that *economically* justifies a higher dollar payment for females than for males, *see* Kimball, *Reverse Sex Discrimination:* Manhart, 1979 Am.B.Found.Research J. 83, 106, whether or not the threshold decision to price the cost of coverage for males and females separately is sound social policy or is consistent with legal requirements, *see Los Angeles Department of Water & Power v. Manhart, supra* (pricing employment benefits higher for females than for males violates Title VII of the Civil Rights Act of 1964).

By contrast, the valuation for which gender-distinct tables are used under section 2037 does not concern anything of reality, but instead concerns only a theoretical construct. When section 2037 focuses attention on the present value of a decedent's reversionary interest in a trust the moment before death, the statute is not concerned with the actual fair market value of that interest. In most cases (all in which the decedent succumbs to a last illness) the actual market value of such an interest will be virtually zero. *See Estate of Allen,* 558 F.2d 14, 21, 214 Ct.Cl. 630 (1977) (Nichols, J., concurring). Unless a decedent dies from sudden and totally unanticipated causes, his realistic life expectancy just prior to death, as distinguished from the average life expectancy of all persons of his age, is too brief to give any real value to his reversionary interest. Moreover, the present value just prior to death is calculated only for those persons who die, a circumstance that eliminates even a theoretical present value for their rever-

sionary interest. The Government recognizes this circumstance:

> In all cases where IRC § 2037 comes into play, the grantor has in fact predeceased the beneficiary. In reality, therefore, the decedent's reversionary interest in a Section 2037 situation has no real value, since reversion can no longer occur. What IRC § 2037 does is provide for the valuation of the reversionary interest hypothetically—without regard to the fact of the decedent's death.

Appellant's Brief at 34. What is being measured in this case is the theoretical value of an interest that the Government concedes has no value in reality. It is difficult to see what important governmental objective is being substantially advanced by using a gender-based discrimination to place a theoretical value on a reversionary interest whose actual value is almost always zero.

I recognize, of course, that Congress had a legitimate reason for wanting the I.R.S. to determine the theoretical value of a reversionary interest just prior to a decedent's death. The reason is tax equity. Prior to the enactment of section 2037, a trust was included in the gross estate no matter how remote the likelihood that the corpus would ever have reverted to the decedent during his lifetime. *See Estate of Spiegel v. Commissioner,* 335 U.S. 701, 707, 69 S.Ct. 301, 303–04, 93 L.Ed. 330 (1949). Congress adopted the 5% cutoff rule of section 2037 to prevent taxation of trusts in which the interest of the decedent, just prior to death, valued on the basis of the average life expectancy for persons of the decedent's age, was too slight to warrant taxation of the entire trust corpus. *See* 1949 U.S.Code Cong.Serv., 81st Cong., 1st Sess., 2172, 2185; *Estate of Allen, supra,* 558 F.2d 17–18 & n. 8.

Thus the inquiry becomes whether tax equity will be substantially advanced by valuing reversionary interests, for purposes of applying the 5% cutoff rule, by means of gender-distinct tables. One important indication that tax equity will *not* be significantly promoted by gender-distinct tables is the recent decision of the Treasury to abandon the use of such ta-

bles. Effective December 1, 1983, the Treasury resumed the use of a unisex mortality table, returning to the practice that had been followed prior to 1970. *See* Treas.Reg. § 20.2031–7(a). I do not suggest that taxation is a field requiring the Government to use the least restrictive means in accomplishing its legitimate objectives. And what the Government elects to do is of course not the determinant of what the Constitution minimally requires it to do. Nevertheless, in the inquiry as to whether gender-distinct tables "substantially" promote an "important" governmental objective, the fact that the Government has come to realize that it can adequately meet its objectives without the use of the challenged discrimination is at least relevant.

Finally, I examine the *degree* to which the use of gender-distinct tables achieves the asserted interest in promoting the accuracy of even the theoretical valuation being made. This requires consideration of what we mean when we say that women as a class live longer than men. We surely do not mean that all women live longer than all men. We do not even mean that most women live longer than most men. One thing we do mean has been expressed by those knowledgeable in the field in the following statistical terms: A woman at the mean of the distribution of mortality for all women will live longer than a man at the mean of the distribution of mortality for all men. *See* Brilmayer, Hekeler, Lay-

cock & Sullivan, *Sex Discrimination in Employer-Sponsored Insurance Plans: A Legal and Demographic Analysis*, 47 U.Chi.L.Rev. 505, 513 (1980) ("*Demographic Analysis*"). That observation, however, tells us little about the degree of accuracy achieved by gender-distinct tables compared to a unisex table. More helpful is the fact that, for a group of people chosen at random, more than 80% of all female deaths can be matched with the deaths of males of the same age.[6] *Demographic Analysis, supra,* at 531. It was this fact that led Judge Stewart to conclude in this case that "only 20% of all women actually do outlive men."[7] 576 F.Supp. at 842.

Gender-distinct tables uniformly estimate a longer life expectancy for all women compared to all men when in fact that estimate turns out to be true for no more than 20% of women.[8] Whether or not the enhanced degree of accuracy in predicting the life expectancy of women as a class would satisfy equal protection standards in a case involving the purchase of retirement benefits, which must be priced prospectively, gender-based tables do not provide a sufficient increment of accuracy to justify the gender-based discrimination inherent in their use when applied to the theoretical valuation of a reversionary interest in a trust just prior to a decedent's death, a valuation that is always made retrospectively. *Cf. Craig v. Boren, supra,* 429 U.S. at 199–204, 97 S.Ct. at 457–60 (invalidat-

---

**6.** The statistic is based on an analysis of a group of males and females aged 65. Bergmann & Gray, *Equality in Retirement Benefits*, Civ. Rights Dig., Fall 1975, at 25. The accuracy, though not the significance, of the statistic has been widely accepted. *Compare Demographic Analysis, supra,* at 531 (arguing in reliance on the statistic), *with* Kimball, *Reverse Sex Discrimination: Manhart, supra,* at 121–22 (accepting the statistic but characterizing the argument from it as a "fallacy" when applied to benefits that must be priced prospectively). For a group randomly selected from the entire population, without regard to age, the extent to which male and female deaths can be matched is probably somewhat lower than the figure reported from the group aged 65.

**7.** The 20% figure appears to be the maximum possible consequence of the fact that 80% of male deaths can be matched with female deaths

at the same age. Though most of the unmatched women die later than most of the unmatched men (a fact reflected in the higher average life expectancies for women as a class), there are undoubtedly some of the unmatched men who live longer than some of the unmatched women. The true percentage of women who outlive men is probably slightly less than 20%.

**8.** Even this slight increase in predictive accuracy is brought into question by the tendency for the differential between male and female life expectancies to change rapidly. *Demographic Analysis, supra,* at 558; Brilmayer, Laycock & Sullivan, *The Efficient Use of Group Averages as Nondiscrimination: A Rejoinder to Professor Benston*, 50 U.Chi.L.Rev. 222, 236 (1983) ("Such an unstable [differential] means that sex is not even a reasonable predictor of the longevity of groups.").

ing discriminatory drinking age statute on grounds of insufficient statistical correlation between alcohol-related traffic offenses and gender).

The majority opinion, in contending that the discrimination involved in this case is not unlawful, rests heavily on the assertion that "the class of all directly affected women" has not been shown to be disadvantaged "compared to the class of all directly affected men." 775 F.2d at 466. The majority makes this assertion after noting the indisputable fact that all other things being equal, under gender-distinct tables, the value of the reversionary interest when the beneficiary is a female is always lower than the value when the beneficiary is a male. From this fact the majority draws what I believe is the totally unsupportable conclusion that "the IRS practice places female beneficiaries in better positions than male beneficiaries." *Id.* at 466. To appreciate the flaw in the majority's argument, one must recognize that the "beneficiary" whose gender affects the value of the reversionary interest is not necessarily the same person who benefits from the tax saving in the event the trust is not included in the taxable estate. The "beneficiary" whose gender affects the value of the reversionary interest is the second life tenant of the trust. The identity of the "beneficiaries" of a reduction in estate taxes depends on how the estate tax attributable to the trust corpus is allocated among *all* persons who would benefit from property of the taxable estate, who may be male, female, or neuter in the case of charities. The second life tenant benefits from the non-inclusion of the corpus in the decedent's taxable estate only in those circumstances where the trust corpus would have borne all or a portion of the estate taxes thereby saved. The most that can be said is that changing the gender of the successor life tenant beneficiary from male to female tends to reduce the possibility of an estate tax on the value of the trust corpus, a consequence that will benefit all the beneficiaries of the estate whose interests would have borne the taxes that are saved and, in some circumstances, will benefit the successor life tenant of the trust. But

there is no subclass of female beneficiaries that always comes out better.

Moreover, even if female beneficiaries sometimes fare better under gender-distinct tables (as in those instances when they happen to be included among the legatees who benefit from reduced estate taxes), that consequence does not eliminate the valid complaint of all female settlors that their gender always results in a higher valuation of the reversionary interest than would occur if these settlors had been males. The focus of an inquiry into whether a gender discrimination adversely affects all class members must be confined to the similarly situated members of that gender. A civil service scoring system that reduces the test scores of all female candidates by five points would not be saved by a proviso that the daughter of any applicant would be entitled to a five-point bonus.

The significance of the dispute in this case has been substantially reduced by the Government's voluntary abandonment of gender-distinct tables to value reversionary interests. The consideration of gender-distinct tables, however, will be with us for many years to come. In this case, for all of the reasons set forth, I respectfully dissent.